STROTHER v. COMMISSIONER OF INTER-
NAL REVENUE.

BANKERS' POCAHONTAS COAL CO. v.
SAME.

Nos. 3214, 3215.

Circuit Court of Appeals, Fourth Circuit.

Jan. 25, 1932.

Camden R. McAtee, of Washington, D. C., and Wells Goodykoontz, of Williamson, W. Va. (Mason, Spalding & McAtee, of Washington, D. C., and Goodykoontz & Slaven, of Williamson, W. Va., on the brief), for petitioners.

Andrew D. Sharpe, Sp. Asst. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and De Witt M. Evans, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before PARKER and SOPER, Circuit Judges, and BAKER, District Judge.

SOPER, Circuit Judge.

Bankers' Pocahontas Coal Company v. Commissioner, No. 3215.

The subject-matter of this suit involves income and profit taxes of the Bankers' Pocahontas Coal Company for the calendar years 1920–1926, as determined by the Board of Tax Appeals. Deficiencies in substantial amounts were charged against the taxpayer in each of these years; and a petition to review was filed. The Board made the following findings of fact with reference to the property concerned:

"In July, 1912, the Bankers' Pocahontas Coal Company, a West Virginia corporation, acquired the fee simple title to approximately 6,200 acres of coal lands, including both the surface and the mineral rights in the State of West Virginia. The land had no appreciable value except for the coal content.

"Upon incorporation in 1912, the corporation acquired by formal assignment and has continued to retain the beneficial interest of the original owners in certain contracts affecting the coal content which were executed in 1901 and 1902 with various operating companies and to which contracts the 6,200 acres and coal content were subject.

"These contracts were originally prepared by D. J. F. Strother, who at that time was attorney, director and stockholder in the predecessor corporations. The form of the contracts is that prevailing in the West Virginia coal fields, which followed the Pennsylvania form of contract as introduced by Pennsylvanians who were largely instrumental in the early coal development in the West Virginia field."

Each of these contracts purported to be a contract of lease between the prior owner of the land, as lessor, and a coal mining com-

pany, as lessee, covering a tract of land in McDowell county, W. Va. for a period of thirty years from January 1, 1901. It was provided that the lessee should have the sole and exclusive privilege of mining and coking coal on the premises, and of conducting a general mercantile business thereon. In consideration thereof, the lessee agreed to pay to the lessor, as rental for the premises, a royalty (ranging from 1 cent to 10 cents) for each ton of coal mined and sold or used for any other purpose than the manufacture of coke, and a larger amount for each ton of coke manufactured and sold upon the premises. In some cases, a minimum annual rental or royalty (ranging from $4,000 to $10,000) was agreed upon. In addition, the lessee agreed to pay all taxes assessed against the property, or the coal mined, coked, or manufactured. The lessee was given the option to renew the lease at its expiration; and provision was made for the final valuation and disposition of the improvements placed upon the land by the lessee.

The contention of the taxpayer is that these contracts, executed in the years 1901 and 1902, and acquired by it in the year 1912, were sales of coal in place that were fully complete before the Sixteenth Amendment went into effect, and that the royalties received during the period 1920 to 1926 were merely payments of obligations that existed unconditionally on March 1, 1913, and were not income taxable under the federal Revenue Acts. It is said that this construction of mining leases as sales of coal in place is the law of the state of West Virginia, laid down by its highest court, and is therefore a rule of property which the federal courts must respect and enforce. The Board of Tax Appeals, however, overruled this contention, and directed that the royalties should be included in the gross income of the taxpayer, subject to taxation.

The application of the income tax statutes passed in conformity with the Sixteenth Amendment to the proceeds of mining was first considered by the Supreme Court in Stanton v. Baltic Mining Co., 240 U. S. 103, 36 S. Ct. 278, 60 L. Ed. 546. The court held that a tax on the product of a mine is not, in its essence, a direct tax on property merely because some exhaustion of the ore body must result from the working of the mine, and that, even though an adequate allowance is not made for the depletion of the mineral, the tax does not become a direct tax on property because of its ownership. On the contrary, it was held in accordance with its former ruling in Stratton's Independence v.

Howbert, 231 U. S. 399, 34 S. Ct. 136, 58 L. Ed. 285, that such a tax is a true excise levied on the business of carrying on mining operations. The Supreme Court reiterated and applied this rule in Von Baumbach v. Sargent Land Co., 242 U. S. 503, 37 S. Ct. 201, 205, 61 L. Ed. 460, where it was held that royalties from mining leases on lands in Minnesota constituted income subject to the Corporation Tax Law of 1909 (36 Stat. 11). It was pointed out that, under the law of Minnesota, such leases are not merely conveyances of the ore in place, and do not constitute a sale of any part of the land, but the ore derived from the operation of the mines constitutes rents and profits from the land. Commenting on this rule, the court said:

"Ordinarily, and as between private parties, there is no question of the duty of the Federal court to follow these decisions of the Minnesota Supreme Court, as a rule of real property long established by state decisions. Kuhn v. Fairmont Coal Co., 215 U. S. 349, 360, 30 S. Ct. 140, 54 L. Ed. 228, 234. Whether, in considering this Federal statute, we should be constrained to follow the established law of the state, as is contended by the government, we do not need to determine. The decisive question in this case is whether the payments made as so-called royalties amount to income so as to bring such payments within the scope of the Corporation Tax Act of 1909. The prior decisions of this court in Stratton's Independence v. Howbert, 231 U. S. 399, 34 S. Ct. 136, 58 L. Ed. 285, and Stanton v. Baltic Mining Co., 240 U. S. 103, 36 S. Ct. 278, 60 L. Ed. 546, in which the Stratton Case was followed and approved, are decisive of this question."

The court also held that there was no difference as to taxability of the gains from the mining operations, whether the ore was extracted by the mine owner, as in the Stratton Case, or by a lessee of the owner, as in the case of the Sargent Land Company.

All of this ground was considered by the Circuit Court of Appeals of the Third Circuit in Rosenberger v. McCaughn, 25 F. (2d) 699, a case which related to income taxes based on royalties or rents from coal lands in Pennsylvania. In that state, the courts apply a different rule from that in vogue in Minnesota, and hold that mining leases constitute sales of the mineral in place; and it was therefore argued that the case must be distinguished from the decisions of the Supreme Court we have cited. But it was held, and we think properly, that the rules of decision laid down by the state courts with regard to property,

while generally controlling upon the federal courts, do not necessarily govern those courts in the interpretation of the laws of Congress in regard to taxation, and it was pointed out that in Von Baumbach v. Sargent Land Company, supra, the Supreme Court had reached the conclusion that royalties from mines constituted taxable income wholly aside from the construction placed by the Minnesota courts upon mining leases. The Supreme Court declined to review this interpretation of its decision when it denied certiorari. 278 U. S. 604, 49 S. Ct. 10, 73 L. Ed. 532. See, also, Hirschi v. United States, 67 Ct. Cl. 637, certiorari denied 280 U. S. 576, 50 S. Ct. 30, 74 L. Ed. 627; Berg v. Commissioner, 59 App. D. C. 86, 33 F.(2d) 641, certiorari denied 280 U. S. 598, 50 S. Ct. 69, 74 L. Ed. 644; Burkett v. Commissioner (C. C. A.) 31 F. (2d) 667, certiorari denied 280 U. S. 565, 50 S. Ct. 25, 74 L. Ed. 619; Alexander v. King (C. C. A.) 46 F.(2d) 235, 74 A. L. R. 174.

We shall assume, for the purposes of this decision, that the law of West Virginia, like that of Pennsylvania, is that a mining lease constitutes a sale of the mineral in place. It was said in National Coal Co. v. Overholt, 81 W. Va. 427, 434, 94 S. E. 735, that the English and many American decisions hold that when, in a mining lease, the parties contract with reference to a mineral known to exist, the quantity of which is unknown and incapable of exact ascertainment, and the lessee covenants to bring forth a minimum quantity annually, and to pay a minimum royalty, the contract amounts to a sale of the mineral in the land, and the lessee is bound to pay the minimum price. See, also, Feather v. Baird, 85 W. Va. 267, 102 S. E. 294; Urpman v. Lowther Oil Co., 53 W. Va. 501, 44 S. E. 433, 97 Am. St. Rep. 1027; Toothman v. Courtney, 62 W. Va. 167, 58 S. E. 915; Smith v. Root, 66 W. Va. 633, 66 S. E. 1005, 30 L. R. A. (N. S.) 176.

■■ Nevertheless, we think that the royalties in question, subject to the deduction allowed by the Acts of Congress, constitute taxable income. There can be no doubt that it was the intention of Congress to tax them. It is provided in section 234 (a) of each of the pertinent statutes, to wit, the Revenue Act of 1918, 40 Stat. 1057, 1078, the Revenue Act of 1921, 42 Stat. 227, 256, the Revenue Act of 1924, 43 Stat. 253, 26 USCA § 986 (a), and the Revenue Act of 1926, 44 Stat. 9, 42 (26 USCA § 986 (a), that in computing the net income of a corporation subject to the income tax, in the case of mines and other natural deposits, there shall be al-lowed as a deduction a reasonable allowance for depletion, according to the peculiar conditions in each case. It does not follow, as the taxpayer assumes, that the royalties cease to be income under the acts of Congress because the leases are sales and the royalties are part payment of the purchase price under the law of West Virginia. It is obvious, as the Supreme Court has pointed out, that something more is involved under a mining lease than a sale and delivery of valuable property. Before the business is complete, there must take place the whole process of locating, extracting, and preparing the ore for market. This is a manufacturing process, and in this aspect the royalties are seen to be income of the business, and as such subject to taxation. The federal courts must respect the local laws of property laid down by the courts of the state, but the power of Congress to tax must be judged by the realities of the situation and not by the logic of state rules of property, pushed inexorably to their extreme.

In Weiss v. Weiner, 279 U. S. 333, 49 S. Ct. 337, 73 L. Ed. 720, the taxpayer, who was in the business of taking long leases on real property and subletting, claimed the right to make an annual deduction from his income for estimated depreciation of the buildings, but the Supreme Court decided that the claim was unfounded, since he was not the owner of the property. The court said (page 337 of 279 U. S., 49 S. Ct. 337, 338):

"It does not matter that in Ohio, where the properties lie, these long leases are treated as in many respects like conveyances of the fee. The Act of Congress has its own criteria, irrespective of local law, that look to certain rather severe tests of liability and exemption and that do not allow the deductions demanded whatever the lessees may be called. We understand this to be the view taken by the Department for a long time and we are of opinion that it should not be disturbed."

It may be noted, in passing, that the Supreme Court of Appeals of West Virginia itself did not apply the rule with regard to mining leases literally when it came to the subject of taxation; for in Harvey Coal & Coke Co. v. Dillon, 59 W. Va. 605, 53 S. E. 928, 6 L. R. A. (N. S.) 628, it held that a mining lease, similar in all substantial respects to those involved in the pending case, constituted a chattel real, taxable to the lessee under a West Virginia statute which provided for the taxation of personal property, including, in that term, chattels real. This decision was made notwithstanding the con-

tention that the deed created, not a chattel real, but a sale of the coal itself in situ, taxable only as realty.

The taxpayer does not seem to deny the force and effect of the decisions of the Supreme Court we have cited, but· claims that the court has since discarded the theory laid down in these cases and has returned to the well-established rule that the state law of property must be accepted and applied by the federal courts. Reference is made to Tyler, Adm'r, v. United States, 281 U. S. 497, 50 S. Ct. 356, 74 L. Ed. 991, 69 A. L. R. 758; Crooks, Col., v. Harrelson, 282 U. S. 55, 51 S. Ct. 49, 75 L. Ed. 156, and Poe, Collector, v. Seaborn, 282 U. S. 101, 51 S. Ct. 58, 75 L. Ed. 239; but it is obvious that each of these decisions turned upon the fundamental question whether the property sought to be taxed came within the purview of the taxing statutes. When it was clear that such was the case, the federal statute was given effect; as in Tyler v. U. S., 281 U. S. 497, 50 S. Ct. 356, 74 L. Ed. 991, 69 A. L. R. 758, where the court held that the value of a tenancy by the entireties should be included in the gross estate of a decedent, for the purpose of computing the tax upon the transfer of the net estate, although, under the state law applicable to such an interest, it could not be said in a strict sense of the term that a transfer of the property had taken place. In the other cited cases, on the other hand, property was held to be excluded from the tax proposed because it did not come within the terms of the statute, and this conclusion was maintained although it was occasioned by observance of a state rule of property, and it was clear that the ruling would bring about a lack of uniformity in the incidence and operation of the tax in different states by reason of diversity of local property rules. The Supreme Court has never abandoned the rule as to the effect of state decisions on questions of property; but it has held in some instances that state decisions do not cover the whole ground to which the federal taxing statutes relate, and, in other instances, that the statutes or decisions of the state lay down rules which define and limit the property which Congress has undertaken to tax.

■ It is next objected that, even if the royalties of the mine are taxable, an insufficient allowance for depletion has been made. The Commissioner estimated the allowance at 3.6 cents per ton, as the value of the coal in place on the basic date of March 1, 1913; and the deficiencies were determined on this basis.

The taxpayer contends that an allowance of 5 cents per ton should have been made, because this sum has been fixed as res adjudicata between the parties by reason of a judgment of the District Court of the United States for the Southern District of West Virginia rendered on January 21, 1928. The Commissioner had previously determined a deficiency against the taxpayer for the years 1914 to 1919, using the unit value of 3 cents per ton, and had imposed additional taxes in the sum of $6,267.08, which the corporation had paid under protest. Thereafter it brought an action against the collector of internal revenue at Parkersburg, W. Va., wherein the court determined that the rate should be 5 cents per ton, and rendered a judgment in favor of the taxpayer for $5,373.01, which the United States paid: Hence the taxpayer claims that the question is no longer open between it and the government, since it is a general principle that, when a fact is distinctly put in issue, and directly determined by a court of competent jurisdiction between the parties in a lawsuit as a ground for recovery, it cannot be disputed in a subsequent suit between the same parties or their privies, even if the second suit is for a different cause of action. Southern Pacific R. Co. v. U. S., 168 U. S. 1, 48, 18 S. Ct. 18, 42 L. Ed. 355; New Orleans v. Citizens' Bank, 167 U. S. 371, 17 S. Ct. 905, 42 L. Ed. 202.

The rule is applicable, however, only when the subsequent suit is between the same parties or their privies. The taxpayer maintains that we have that situation in the present litigation because the United States in reality is its opponent in both cases, being represented by the collector of internal revenue in the prior suit, and by the Commissioner of Internal Revenue now. But the argument is refuted by the decision in Sage v. United States, 250 U. S. 33, 39 S. Ct. 415, 63 L. Ed. 828, where it was expressly ruled, against the protest of the government, that the court was not bound by a judgment in a former suit concerning the same subject-matter between the taxpayer and a collector of internal revenue, because a suit against a collector of internal revenue is personal, and its incidents, such as the nature of the defenses open and the allowance of interest, are different. This ruling has recently been cited with approval by the Supreme Court in Graham & Foster v. Goodcell, 282 U. S. 409, 430, 51 S. Ct. 186, 75 L. Ed. 415. The decision of the District Court for the Southern District of West Virginia was therefore not binding upon the Commissioner, and he had the author-

ity to determine anew, as a question of fact, what allowance should be made for the depletion of the mine.

■ In reviewing the Commissioner's determination, the Board took into consideration not only the evidence introduced before the District Court in the prior case, but also additional evidence. The president of the corporation testified that the cost of the property, when acquired in 1912, did not exceed $507,000, a fact casting strong light on the value of the property on March 1st of the following year; in 1915, an engineer estimated that there were then 20,000,000 tons of mineable coal, having a total value of $1,000,000; on December 31, 1917, an entry was made upon the general ledger of the taxpayer that the estimated value as of March 1, 1913, on the basis of 20,000,000 tons of coal at 5 cents a ton was $1,000,000; and the income tax return filed for these years claimed a March 1, 1913 value of the property of $1,000,000. A stipulation, filed by the parties before the findings of fact and opinion of the Board were made, to be received as a statement of fact upon any question necessary to any computation under rule 50 of the Board, contained a schedule showing that the estimated recoverable tonnage on March 1, 1913, was 37,608,642 tons. The stipulation also included a résumé of the leases, with the approximate acreage and royalties per ton in each, and also the tonnage mined and royalties received, for the years 1913 to 1919, inclusive, as well as the tonnage mined, the tonnage paid for, and the royalties received for the years 1920 to 1926. From this résumé of facts it is obvious that there was substantial evidence to support the finding of the Board. As it pointed out, an allowance of 3.6 cents per ton would return to the taxpayer a total of $1,353,911.11 upon the tonnage estimated in the stipulation. It is true, as the taxpayer contends, that a different result might have been based upon the evidence in the record; but it is not the province of this court to find the facts anew. We merely ascertain whether there is substantial evidence to support the findings of the Board.

■ The taxpayer objects to the use by the Board, in determining the depletion rate, of the estimated tonnage in place on March 1, 1913, as shown by the stipulation. It is said that the stipulation was made merely to aid in the computation of the deficiency under rule 50. The rule is applicable when the Board determines the issues in any proceeding, and withholds decisions of deficiencies for later computation. If the parties are in agreement as to the amount, copies of their computation are filed for entry of the decision; but, if not in agreement, the parties may file their respective computations, and an opportunity to be heard is afforded. But any hearing is strictly confined to the consideration of the correct computation, and no argument may be made upon issues or matters disposed of by the report of the Board, or upon any new issues. The stipulation was filed in this case before the time had arrived for the filing of computations under the rule. The Board had not yet determined the principles to be applied in the computation of the deficiencies, and one of the important issues was the rate of depletion to be used in case the royalties should be held to be income. The stipulations of fact were obviously filed by the parties to enable the Board to reach correct conclusions upon the disputed points. We think the Board properly took the stipulated facts into consideration in determining the depletion allowance. They could not justly have been considered for one purpose and not for others.

■ After the Board had filed its findings and opinion, the parties filed conflicting computations of deficiency, which then came on for hearing under rule 50. The taxpayer then for the first time made the point that the schedules filed showed that under two leases, the coal paid for in several years substantially exceeded the coal mined, and offered to introduce the leases to show that the payments were made as minimum royalties required under the contracts, with leave, to the lessees, at any subsequent time, to take out the coal paid for. The Commissioner objected to the offer as new matter not receivable at that stage of the proceedings, under the provisions of the rule. The Board decided that the offer constituted in effect a request for rehearing and reargument, and finally filed its order of decision without granting a rehearing or considering the evidence offered. This ruling the taxpayer assigns as error.

It is provided in Regulations 45, 62, 65 and 69, Article 216, that in case a lessee under a mining lease is required to pay annually a specified sum to be applied in payment of royalty for mineral, whenever the same shall be extracted and removed, the value in the ground to the lessor, for purposes of depletion, of the number of units so paid for in advance, will constitute an allowable deduction from the gross income of the year in which the payment shall be made. It would have been proper to have introduced the leases in evidence at the original hearing of the case

before the Board had determined the issues involved. But the taxpayer put in evidence only one of the contracts of lease as typical of all the rest. Under this form of lease, the right of the lessee to mine additional coal to offset the excess of royalty paid in any year was limited to the next succeeding year after the amount necessary to produce the minimum royalty for that year had been mined. To such a situation under the facts proved, Article 216 had no relevance. The Board was accordingly correct in its ruling that to receive in evidence the new matter offered by the taxpayer was equivalent to the granting of a rehearing of the case. It was within the sound discretion of the Board to grant or deny the taxpayer's motion; and since the evidence must have been in the possession of the taxpayer from the beginning, we cannot say that the discretion of the Board was abused. Boggs & Buhl v. Commissioner (C. C. A.) 34 F.(2d) 859, 861.

Another question for decision relates to the sum of $3,770.40 paid to the corporation in 1924 as damages for an unlawful trespass. The Board made the finding of fact that in 1920, the Flanigan Coal Company, which owned land adjacent to that of the taxpayer, trespassed on the latter's land and removed coal to which it had no right. It then destroyed the entries, and as a result the extent of its operations could not be determined. The situation was discovered in 1923, whereupon the taxpayer brought suit for damages, and claimed compensation not only for the coal removed, but also for damages to the property. In 1924 the suit was compromised by the payment mentioned, but this settlement had no relation to the coal extracted, as the amount of the same could not be determined. The Board quoted the testimony of the president of the corporation to the effect that the destruction of the entries had absolutely destroyed the method of going into the mine at that point, that he and his engineers had estimated that the damages to the property and to the seam of coal were at least $10,000, and that $3,770.40 was accepted because the trespasser at the time was in a precarious financial condition.

The Commissioner held that the damages received constituted gross income in the year 1924, that the trespasser had mined or damaged 15,000 tons of coal, and that the taxpayer was entitled to deduct from the amount received the sum of 3.6 cents per ton, or $540, for depletion. The Board sustained this action. It said that a loss caused by a tortious act, if not compensated for by insur-

ance or otherwise, is deductible from gross income, but that the evidence did not afford facts from which the amount of the loss might be determined, and that the cost of the coal removed by the trespasser or its value on March 1, 1913, was not known. Hence it held that no deduction could be allowed for loss in 1920. As to the year 1924, it made the following statement:

"The same situation obtains with respect to the year 1924. The company received from the trespasser $3,770.40. The petitioner has found that all but $540 of this amount (which he has allowed as a deduction from gross income as depletion) constituted taxable income of the company for 1924. The company has submitted no evidence that the cost or March 1, 1913, value of the coal removed by the trespasser was in excess of $540 or that such basis plus damages to the property was in excess of $540. The determination of the Commissioner is therefore sustained for lack of evidence showing error on the part of the respondent."

The taxpayer objects to this addition to its income for the year 1924, on the ground that the money paid by the trespasser was merely compensation for injury to the mine, and was in effect a return of capital. Any loss or gain in the transaction could be determined under the circumstances only upon a final disposition of the property. We think this position is sound. If the taxpayer were asking for a deduction from income in 1920 for the loss caused by the trespass in that year, it would be within the province of the Board to determine whether the evidence submitted by the taxpayer was sufficiently definite to justify the allowance claimed. The finding of the Board, that the amount of the coal removed could not be ascertained, showed that the amount of the loss was uncertain. But this finding likewise shows that the Commissioner's action in adding the sum of $3,770.40 to the gross income of the taxpayer in 1924, was without foundation. If there had been substantial evidence to support the finding that 15,000 tons of coal had been unlawfully extracted, and that $3,770.40 had been paid solely in settlement of that wrong, it would have been proper to have added this amount to the gross income, less the expenses for collection and an allowance for depletion. The balance remaining would have been as clearly profit in the taxpayer's hands as if it had been paid by a lessee operating on a royalty basis. But the situation is confused by the fact that the amount of coal extract-

ed is not known. So far as can be told from the record, the amount paid by the trespasser may not have exceeded payment at the rate of 3.5 cents per ton. In addition, there is the uncontradicted evidence of substantial damage to the approach to the mine.

These circumstances show that the Commissioner was not warranted in adding the sum of $3,770.40, less an estimated depletion allowance of $540, to the corporation's taxable income for the year 1924. We are not dealing with a situation like that considered by the Supreme Court in Burnet v. Sanford & Brooks Co., 282 U. S. 359, 51 S. Ct. 150, 75 L. Ed. 383, but with a loss of capital investment. In Doyle v. Mitchell Bros. Co., 247 U. S. 179, 185, 38 S. Ct. 467, 469, 62 L. Ed. 1054, the court, speaking of such a question, said: "In order to determine whether there has been gain or loss, and the amount of the gain if any, we must withdraw from the gross proceeds an amount sufficient to restore the capital value that existed at the commencement of the period under consideration." A taxpayer is not allowed to deduct a loss from gross income until the amount is definitely fixed and ascertained; and, for the same reason, he should not be charged with gain on pure conjecture unsupported by any foundation of ascertainable fact. See Burnet v. Logan, 283 U. S. 404, 51 S. Ct. 550, 75 L. Ed. 1143.

It follows that, as to the determination of the deficiencies of the corporation for all of the years in question except the year 1924, the action of the Board is affirmed, and as to that year, the case is remanded for further proceedings in accordance with this opinion.

Strother, Petitioner, v. Commissioner of Internal Revenue, No. 3214.

This case relates to the income of a stockholder of the Bankers' Pocahontas Coal Company derived from dividends by which the greater part of the royalties which the corporation received were distributed. During the several years involved in the foregoing case, 1920 to 1926, Strother, as one of the corporation's stockholders, received dividend payments from the company and reported them in his income tax returns, but did not return them as taxable income. The Board found, in its original findings of fact, that the corporation made distribution of the entire amounts received by it as royalties, including any depletion reserve. The Commissioner determined as deficiencies against Strother the total amounts received by him from the company, and made no allowance for that part of the moneys which constituted depletion of the capital. Upon these facts, the Board held in its opinion that, to the extent that the distribution made by the corporation constituted a distribution of depletion reserve, the amount received by Strother was nontaxable.

The opinion established, as we have seen, that the royalties constituted income to the corporation, and not the proceeds of sale of mineral in place, and that the proper allowance for a depletion reserve was at the rate of 3.6 cents per ton. By stipulation of the parties, the decision on these matters was adopted in the Strother Case. After the decision was rendered, a hearing was held upon the recomputation of the Strother deficiencies. Strother objected to the new computation proposed by the Commissioner because it did not provide for the deduction from the dividends received of a proportionate part of the entire allowance for depletion. It seems that the total depletion allowance of the corporation for the years in question was $125,-000, but the computation was made as if the total allowance was only $90,000. Apparently, the Commissioner held that a sum retained by the corporation in each year to meet the tax deficiency, was in fact part of the allowance for depletion, and to that extent the allowance for depletion had not been included in the dividends. Another question seemingly involved was whether or not, in determining how much of the dividends were capital, the total net income and the total depletion for the year should be prorated to the date of each dividend payment.

These questions appear to be those which are raised by the petitioner; but the record in the case is so vague that we cannot obtain a clear conception either of the facts to be considered or the questions of law to be decided. This situation doubtless arose because the important questions in which the parties were interested were those concerning the character of the royalty payments as return of capital or income, and, if income, the proper allowance to be made on account of depletion. A decision could not be reached in the Strother Case until these questions had been determined. At the hearing on the question of recomputation of the Strother deficiencies, it was pointed out by counsel for the Commissioner that the record did not supply a complete basis for recomputing the Strother tax; that, strictly speaking, the taxpayer had failed to maintain the complete burden of proof, but that this was not reasonably to be expected under the circumstances. It was conceded that the recomputation proposed by counsel for Strother was literally in compli-

ance with the decision of the Board, but that this decision was in need of revision. Thereupon the Board announced that it would make an amendment of its findings of fact, and this was filed after the hearing. Instead of the statement that the corporation distributed the entire amount received from its operating contracts, the finding was substituted that the corporation used such portion of the royalties as was necessary for the payment of administration expenses, set aside a certain reserve to meet the federal taxes, and distributed the rest to the stockholders. No change was made in the opinion as to the holding that, to the extent the amounts received by Strother included depletion reserve, they were not taxable; and without further recomputation, the decision complained of was promptly entered.

The government's brief in the case before us suggests that the record does not contain sufficient facts to permit a determination of the questions raised, and that therefore the Board's decision should not be disturbed. We think, however, that under the circumstances, it would be just for the Board to give further consideration to the Strother Case, and to afford to the taxpayer an opportunity to introduce additional testimony to bring out the facts necessary to a decision of the issues involved. The case will therefore be remanded for further proceedings in accordance with the opinion in the case of Bankers' Pocahontas Coal Company v. Commissioner, in so far as it determines the questions involved herein, and without prejudice to the right of petitioner to rely upon the legal positions as to other matters urged upon this appeal.

Case No. 3214 remanded for further proceedings.

Case No. 3215 modified.