**Louis L. GOWANS and Helen T. Gowans, husband and wife, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 15247.**

United States Court of Appeals
Ninth Circuit.

June 17, 1957.

Robertson, Castle & Anthony, Frank D. Padgett, Honolulu, Hawaii, for petitioners.

Charles K. Rice, Asst. Atty. Gen., David O. Walter, I. Henry Kutz, Attorneys, Department of Justice, Washington, D. C., for respondent.

Before POPE, LEMMON, and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge.

This matter is before us on a taxpayer's petition to review a decision of the Tax Court of the United States. In that decision, the tax court upheld a $9,561.30 income tax deficiency determination by the Commissioner of Internal Revenue, covering the calendar years 1948, 1949, and 1950.

The prime question presented is whether the net proceeds from a certain transaction involving removal of sand from the taxpayers' property were ordinary income or capital gain. The taxpayers regarded the proceeds as capital gain, and so reported them in their income tax returns for those years. The commissioner and the tax court regard them as ordinary income.

Most of the essential facts have been stipulated. Petitioners were the owners of two three-acre lots situated on a hillside in Honolulu. Portions of the property were so steep that extensive grading would be required before they could be improved by buildings. The lots were found to contain a deposit of a volcanic material known as "black sand," valuable in the manufacture of tile products. In the fall of 1944, Honolulu Construction and Draying Company, Ltd., desired to purchase approximately 4.33 acres of these lots, to obtain this sand. Under Hawaiian law, these particular lots could not be sold to a corporation without the approval of certain officials. Because the required approval could not be obtained, this proposed sale was not consummated.

On September 4, 1945, the parties entered into a written agreement which provided for the sale and purchase of the desired portions of the two lots. It was further provided that, if approval for such a sale could not be obtained, the company would quarry the sand, paying forty cents a cubic yard for sand so withdrawn. These payments were to be made monthly, as the sand was removed. The contract specified the amount of sand to be so quarried—two hundred fifty thousand cubic yards—based upon information developed by the company's surveyor.

Under the agreement, the company obligated itself to remove all of this sand before expiration of five years from the date of the contract. It further agreed to complete the grading of the lots and leave them in good order and condition for sale and use as building lots. It also undertook, within this five-year period, to grade and pave a thirty-foot subdivision roadway, and to install a water pipe line.

Since approval for a sale of a portion of the lots by square footage could not be obtained, the transaction was consummated on the basis of the alternative quarrying plan. The parties, by oral agreement, arranged to have the company build a house on one of the lots, at a cost of $19,322.81, and to reimburse itself by taking credit for sand withdrawals. After this had been accomplished, the company, pursuant to another oral agreement, made uniform monthly payments to a bank to which petitioners had assigned the contract, without regard to the actual amount of sand being removed.

On May 19, 1950, the parties entered into an agreement extending the time for removal of the sand for one year—to July 1, 1952. This agreement, as did the first one, refers to the parties as "buyer" and "sellers." It recited that the company had the "right and obligation" to remove approximately one hundred thirty-three thousand cubic yards of black sand upon a "royalty" payment of forty cents per cubic yard.

It is provided in the extension agreement that the taxpayers would execute a note to the bank in the sum of $48,960. As a part of the consideration for the extension, the company agreed to pay the interest on this note and the real property taxes attributable to the sand acreage. The agreement provided that, commencing June 20, 1950, all "royalty" payments were assigned to the bank as security for the repayment of the note.

The company obligated itself to pay off this note at the rate of $2,040 a month, without regard to the rate of sand withdrawals. The company agreed that, after the note was paid off in this amount, it would make all further "royalty" payments to the taxpayers.

All of the sand—250,010 cubic yards —was removed prior to the termination of the extended period. In quarrying the sand, the company was permitted to take approximately 15,500 cubic yards from below the established grade level, and to fill the resulting holes with nonsalable material. The taxpayers received in cash, or as payments upon their outstanding promissory notes, $100,004. These amounts were charged on the company books to "royalty" accounts. In its correspondence with the taxpayers, the company also regularly referred to the payments as "royalties."

On their income tax returns for 1948 to 1950, inclusive, the taxpayers reported the respective amounts received under these contracts as long-term capital gain from the sale of a capital asset taxable at the rate of fifty per centum. In his deficiency determination, the Commissioner of Internal Revenue held that the full amounts were taxable as ordinary income.

Petitioners were entitled to report the proceeds of these contracts as capital gain if the transaction was one for the sale of property held as a capital asset.[1]

■ It is not disputed that the company was the owner of the black sand after removal of the sand from the deposit. This, however, is not enough to characterize the arrangement as a "sale," within the meaning of the taxing statutes. Burnet v. Harmel, 287 U.S. 103, 106, 53 S.Ct. 74, 77 L.Ed. 199.

■ In a series of decisions beginning with Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489, the principle has been developed that an arrangement involving the extraction and removal of natural deposits from the land of another is to be deemed a "sale" only if, at the time such arrangement is entered into, the owner has alienated all interest therein. Stated conversely, if an economic interest in the deposits has been retained, the transaction is not to be regarded as a "sale" for tax purposes. In that event, the proceeds of the transaction are to be reported as regular income, subject, under certain conditions, to the deduction of a percentage depreciation allowance.[2]

In holding that petitioners retained an economic interest in the black sand, the tax court relied principally upon its decision in Crowell Land & Mineral Corporation, 25 T.C. 223. In that case, involving the extraction and removal of sand from a part of the taxpayers' acreage in Louisiana, it was held that the taxpayers had reserved an economic interest.

Unfortunately for respondent, the decision of the tax court in the Crowell case has recently been reversed. Crowell Land & Mineral Corp. v. Commissioner, 5 Cir., 242 F.2d 864, decided April 12, 1957. Respondent concedes that there is no relevant distinction between the facts of this case and those of Crowell. Petitioners go further, and assert that the facts here are much stronger for the taxpayer than they were in the Crowell case.[3]

---

1. 26 U.S.C.A. (I.R.C.1939) § 117 (a, b).

2. Prior to 1951, only ordinary cost depletion was available for sand and gravel. By § 319 (a) of the Revenue Act of 1951, c. 521, 65 Stat. 452 (26 U.S.C.A. (I.R.C.1939) § 114 (b) (4) ), sand and gravel were added to the list of products qualifying for percentage depletion.

3. They point to these distinctions: (1) In Crowell, there was no absolute obligation to remove the sand, while there was such an obligation here; (2) the Crowell contract contained an express provision for a reversion of deposits not removed, while the instant contract did not; (3) in Crowell, any payment over the minimum stipulated in the agreement was contingent on removal of the material, but this was not true in the present case; (4) while under the original contracts in both cases there were to be regular payments in advance, the

Whether or not the facts of this case should be deemed "stronger" for the taxpayer than were the facts in Crowell, we consider the facts here sufficiently different to warrant independent examination of the question.

■ An economic interest has been retained where the owner has: (1) acquired, by investment, any interest in the natural deposit in place; and (2) secured by any legal relationship income derived from the extraction of the natural deposit to which he must look for a return of his capital. Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, 314, 76 S.Ct. 395, 100 L.Ed. 347. It is not in dispute that the first of these tests has been satisfied in the instant case.[4]

■ In discussing the second part of this test, the parties have pointed to various circumstances as showing that petitioners did, or did not, look to the income derived from extraction of sand for a return of their capital. All of these have been considered and appraised, but three of them, discussed below, seem to us to be decisive here.[5] In our view, these factors, in combination, establish that petitioners retained no economic interest in the sand.

One such factor is that, in so far as petitioners are concerned, a principal, if not controlling, purpose of the contracts was to prepare the property for development as a real estate subdivision. While the exploitation of the natural sand de-

posits was presumably not an unwelcome feature of the arrangement, what petitioners primarily desired was the preparation of their tract for building purposes. It is for this reason that the company was required to conform to established grade levels in removing sand, to grade the tract after the sand had been removed, to grade and pave an access road, and to install a water pipe line. The company's surveyor estimated that it would cost approximately thirty-two thousand dollars to do this work.

It has been held that where the predominating purpose of the agreement is the economic exploitation of the deposits, this is indicative of retained economic interest. West v. Commissioner, 5 Cir., 150 F.2d 723, certiorari denied 326 U.S. 795, 66 S.Ct. 488, 90 L.Ed. 484. It would seem to follow that where some other purpose predominates, the opposite conclusion concerning retention of economic interest would be invited. See Olinger v. Commissioner, 27 T.C. 93, decided October 22, 1956.

The second factor which, with the other two discussed herein, seems to us decisive is that, under the contracts, the company obligated itself to remove all of the sand. The location and amount of sand had been determined with great accuracy. Petitioners desired all of it to be removed so that the grade levels necessary for a subdivision development could be established. Consequently, the company was given no latitude with re-

1950 agreement in the instant case gave the taxpayers twelve thirteenths of the remaining consideration in a lump sum; and (5) in Crowell, the amount of material to be removed and paid for was uncertain, while here it was fixed by a surveyor's calculations which proved to be remarkably accurate.

4. Ordinarily, this part of the test becomes important only where the taxpayer is claiming that the proceeds are regular income, subject to a depletion allowance. The commissioner may question whether such taxpayer ever had an investment interest in the property. But where, as here, the taxpayer is claiming that the proceeds represent a capital gain, there is usually no contention by the commis-

sioner that the taxpayer has never had an investment interest in the property. His position, rather, is generally that the taxpayer has always had an investment interest and still retains it, at least in part.

5. Among the factors advanced by one party or the other but not discussed in the opinion are the following: The use of the terms "buyer" and "seller"; the use of the term "royalty"; the lack of an express provision for reverter or reconveyance; the provision that, in event of condemnation, petitioners would receive the compensation; and the extent to which the surveyor's grade levels were disregarded.

gard to how much sand it would remove. A failure to remove all of the sand would have been a breach of contract for which petitioners could have sought the usual remedies.

In this respect, the case before us differs from Barker v. C. I. R., 24 T.C. 1160, relied upon by the tax court. In that case, it was agreed that there was no obligation to remove any sand and gravel.

A third factor which, in combination with the two already discussed, indicates to us that no economic interest was retained, has to do with the method of compensation which was followed.

Since there was an obligation to remove all of the sand, there was also an obligation to pay for all of the sand contained within the deposit. Hence the fact that there was a unit price and provision for monthly payments loses significance as an evidence of retained economic interest. The obligation to pay for this sand was a "fixed liability," and, in this respect, our case differs from Godshall v. Commissioner, 13 T.C. 681.

Moreover, this plan of relating monthly payments to amount of sand removed was, for the most part, abandoned. The company gave petitioners immediate compensation in the form of a nineteen-thousand-dollar house constructed on one of the lots, and reimbursed itself by taking credit for subsequent sand withdrawals. It thereafter paid regular monthly sums to the bank, under both the original contract and the extension contract, without regard to the rate of sand withdrawals.

Nor were these payments the only consideration petitioners received under the contract. They received grading, paving, and water pipe laying work valued at thirty-two thousand dollars. Under the extension agreement, they received, in the form of company assumption of their note to the bank, a lump sum payment equivalent to twelve thirteenths of the remaining amount due under the contract.

In Commissioner of Internal Revenue v. Southwest Exploration Company, supra, 350 U.S. at page 314, 76 S.Ct. at page 399, it is said that the second part of the test of economic interest, now under discussion, "has been interpreted to mean that the taxpayer must look *solely* to the extraction of oil or gas for a return of his capital." Here, petitioners did not look solely to the extraction of sand for their compensation. They received substantial compensation wholly unrelated to sand withdrawals. Nor was payment of that part of the compensation which was related to sand withdrawals dependent upon production. See Helvering v. Elbe Oil Land Co., 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904.

In view of the combined circumstances referred to above, and quite apart from the precedent established in the Crowell case, we hold that petitioners did not retain an economic interest in the sand which the company engaged to remove. They were accordingly entitled to report the proceeds of the contracts as capital gain.

Petitioners ask us, in the event of a favorable ruling on the capital gain question, to order a refund of the amount of capital gain taxes paid in 1948, 1949, and 1950, on the basis of an installment sale. They argue that, since no initial payment was made at the time the 1945 agreement was executed, petitioners were not entitled to regard this as an installment sale.[6]

■ This contention was also made in the tax court. However, the matter was not dealt with by that court, since it was there held that the payments in question should not have been reported as capital gain. As our only function in these cases is one of review, it will be necessary to remand the case to the tax court for initial determination of this question.

Reversed and remanded for further proceedings consistent with this opinion.

6. See 26 U.S.C.A. (I.R.C.1939) § 44(a, b); U. S. Treasury Regulation 111, § 29.- 44-2; Gilbert v. Commissioner, 9 Cir., 241 F.2d 491.