Walter R. **LAUDENSLAGER** and Marguerite Laudenslager, Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE.**

No. 13753.

United States Court of Appeals Third Circuit.

Argued Jan. 25, 1962.

Decided June 27, 1962.

Morris J. Oppenheim, Asbury Park, N. J., for appellant.

Giora Ben-Horin, Washington, D. C. (Louis F. Oberdorfer, Lee A. Jackson, Joseph Kovner, Washington, D. C., on the brief), for appellee.

Before KALODNER, STALEY and SMITH, Circuit Judges.

KALODNER, Circuit Judge.

This petition to review the decision of the Tax Court [1] presents the question whether amounts received by taxpayers under a contract for the excavation and removal of earth fill from their land constitute ordinary income, as the Tax Court held, or capital gain, as taxpayers contend.

The facts as found by the Tax Court are as follows:

On October 1, 1945, taxpayers, Walter R. Laudenslager and his wife Marguerite, purchased certain property in Middletown Township, Monmouth County, New Jersey, which they used as a residence and farm.

In 1952 the New Jersey Highway Authority ("Authority") fixed and announced the alignment for a proposed limited access toll highway which cut across a section of taxpayers' property. A portion of their property was taken in condemnation by the Authority. Their remaining property was located approximately 300 to 400 feet from the Red Bank entrance to the new highway.

George M. Brewster & Son, Inc. ("Brewster"), a road building contractor, became the successful bidder for the contract to construct the section of the highway adjacent to taxpayers' property. Brewster's contract with the Authority provided that it would be its responsibility to acquire "borrow" material (fill dirt required for road construction) from an outside source at its own expense to complete. the highway to its final grades and elevations. Brewster, prior to submitting its bid, had determined through tests that taxpayers' property could provide the requisite quantity and quality of earth fill, and had inquired of taxpayers whether it could buy either a section of their farm from which the fill

4. The Memorandum Findings of Fact and Opinion of the Tax Court are reported at 20 CCH Tax Ct.Mem. 384 (1961).

could be obtained, or the fill itself. Taxpayers refused to sell any of their property but agreed to permit Brewster to buy fill from certain sections of it. On May 1, 1953, taxpayers and Brewster entered into an agreement which provided, in pertinent part, as follows:

"WHEREAS, * * * [Brewster] desires to purchase from * * [taxpayers] earth fill to be excavated from portions of the above described premises.

"Now THEREFORE, * * * [taxpayers] hereby * * * [agree] to permit * * * [Brewster], its agents and servants, to enter into and upon and leave from the above described premises over existing roadways with all necessary equipment therefor, and to excavate and remove from the said premises earth fill or other material therefrom in conformity with and according to the Grading Plan approved and signed by both parties hereto * * *, and * * * [Brewster] agrees to complete the excavation and grading in accordance with the aforesaid Grading Plan. It is agreed by both parties hereto that * * * [Brewster] will confine its grading operations within the limits as shown on the aforesaid Grading Plan * * *.

"Any material excavated and removed from the said property shall become the property of * * * [Brewster] according to the terms and conditions of this Agreement.

" * * * [Brewster] agrees to pay unto * * * [taxpayers], the sum of Five Cents ($.05) per cubic yard for all material removed from said property. It is further understood and agreed between the parties hereto that a minimum quantity of 400,000 cubic yards is to be removed from said property and that this minimum quantity is based on the original borrow material requirements of 795,700 cubic yards as specified on the contract made between * * * [Brewster] and the New Jersey Highway Authority-Garden State Parkway. * * *

"Notwithstanding the provisions herein with respect to the minimum quantities called for under this Agreement, it is expressly understood and agreed that should the New Jersey Highway Authority reduce the original borrow material requirements on the aforesaid contract, then and in that event the minimum quantities called for herein and the total amount payable hereunder will be reduced accordingly. It is agreed by and between the parties hereto that should the aforesaid minimum quantity be decreased or increased * * * [Brewster] will provide * * * [taxpayers] with a Revised Grading Plan, if requested by * * * [taxpayers], which Revised Grading Plan shall reflect the grades and appearances of the premises based upon such increase or decrease.

" * * * [A]ll payments will be made on or about the 15th day of each month for material excavated, removed and used in the performance of the aforesaid contract during the preceding month. * * *

" * * * [Brewster] hereto advances to * * * [taxpayers] on account of this agreement, the sum of Five Thousand Dollars ($5,000.00) to be credited against payments due hereunder.

"The borrow material being purchased under this contract is required to meet specifications provided by the New Jersey Highway Authority. It is understood and agreed that * * * [Brewster] shall not be required to take or remove any material which does not meet such specifications and that if there shall not be sufficient quantities available which shall meet such specifications in the area involved in this contract, * * * [taxpayers] will allow * * [Brewster] to enter into and acquire further areas within which to remove suitable borrow material. *. *

"IT IS AGREED by and and between the parties hereto that * * * [Brewster] will remove and stockpile outside of the adjacent grading limits all top soil from any part of said premises from which material is excavated and to respread all or part of top soil upon the graded area, at the termination of the operation if requested by * * * [taxpayers], for the sum of Twenty-five Hundred Dollars ($2,500.00), said sum to be deducted from payments due hereunder. * * *"

Attached to the May 1, 1953 agreement was a map of taxpayers' property showing the area from which Brewster was to remove earth fill and the depth of the excavation to be made in order that Brewster might obtain the 400,000 cubic yards specified in the agreement. As work on the highway progressed Brewster needed additional fill. Each time more fill was needed, Mr. Laudenslager and a representative of Brewster decided upon the area from which such material could be taken and they established an elevation down to which the material could be removed, such elevation coinciding with and matching the elevation on an adjoining area from which material had already been taken. The excavation and removal operations, which took place during the period from July 1953 to August 1954, were performed by Brewster; taxpayers did not participate in the work. A total of 1,036,180 cubic yards of fill was taken from taxpayers' property, as follows:

| Period | Cubic Yards Excavated and Removed |
|---|---|
| July, 1953 | 125,000 |
| August, 1953 | 75,000 |
| September, 1953 | 160,000 |
| October, 1953 | 120,000 |
| November, 1953 | 100,000 |
| December, 1953 | 120,000 |
| January 1, 1954 to August 2, 1954 | 336,180 |

The fill was ordinary, sandy loam, generally characteristic of the area in which taxpayers' property was located and had no intrinsic value, by and of itself. It was the proximity of taxpayers' property to the section of the highway being constructed that made the property valuable as the source for obtaining fill required in the construction of the road. If Brewster had excavated more fill than it needed, it could not have sold it because there was no market for it.

Brewster complied with the provisions of the May 1, 1953 agreement requiring it to remove and stockpile the topsoil before excavating the fill. At taxpayers' request, and in accordance with the agreement, Brewster respread the topsoil when the work of excavation had been completed. The area that was excavated had previously been used by taxpayers for growing farm crops. After the excavation of the fill and the respreading of the topsoil, the area would have required several years of rehabilitation to regain its original productive quality.

The coming of the highway made taxpayers' property desirable for housing development. Taxpayers had decided to sell the property for such purposes prior to the transaction with Brewster; and by agreement dated January 27, 1954, as modified by supplemental agreements dated April 14, 1954 and May 20, 1954, they sold all of the property except the buildings and land surrounding the buildings which they reserved for themselves. The usefulness of the property for housing development purposes was neither impaired nor enhanced by the removal of the fill.

Taxpayers were not engaged in the business of buying and selling real estate. Except for the transaction with Brewster, they never sold or excavated any dirt, earth or other material from their property.

Brewster made the following payments to taxpayers pursuant to the

agreement for the excavation and removal of the fill:

| Date of Payment | | Amount |
|---|---|---|
| May 12, 1953 | | $ 5,000.00 |
| August 11, 1953 | | 1,250.00 |
| September 16, 1953 | | 3,750.00 |
| October 13, 1953 | | 8,000.00 |
| November 11, 1953 | | 6,000.00 |
| December 12, 1953 | | 5,000.00 |
| January 16, 1954 | | 6,000.00 |
| October 27, 1954 | $16,809.00 | |
| Less: charges for respreading topsoil | 2,500.00 | 14,309.00 |
| TOTAL | | $49,309.00 |

The Tax Court held that these payments were taxable as ordinary income to taxpayers for the years 1953 and 1954.

The Supreme Court long ago set forth the basic principles applicable to the taxation of receipts from the extraction of natural deposits. In Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932), a taxpayer, the owner in fee of certain oil lands, had executed oil and gas leases of the lands in return for cash bonus payments and for royalties measured by the production of oil and gas by ·the lessee. In declaring that the bonus payments and royalties were taxable as ordinary income rather than as gain from a sale of capital assets, Mr. Justice Stone stated (p. 107, 53 S.Ct. p. 75):

> " * * * [T]he statute speaks of a 'sale,' and these leases would not generally be described as a 'sale' of the mineral content of the soil, using the term either in its technical sense or as it is commonly understood. Nor would the payments made by lessee to lessor generally be denominated the purchase price of the oil and gas. By virtue of the lease, the lessee acquires the privilege of exploiting the land for the production of oil and gas .for a prescribed period; he may explore, drill, and produce oil and gas if found. Such operations with respect to a mine have been said to resemble a manufacturing business carried on by the use of the soil, to which the passing of title of the minerals is but an incident, rather than a sale of the land or of any interest in it or its mineral content. Stratton's Independence v. Howbert, 231 U.S. 399, 414, 415 [34 S.Ct. 136, 58 L. Ed. 285]; see Von Baumbach v. Sargent Land Co., 242 U.S. 503, 521 [37 S.Ct. 201, 61 L.Ed. 460]."

Although in Harmel the receipts were held to be ordinary income, that case does not hold that a transaction involving the extraction of natural deposits from the land of another can never give rise to capital gain. The test for determining whether the proceeds of a given transaction constitute ordinary income or capital gain is known as the "economic interest" test and has evolved from the inter-relationship between the capital gains provisions of the revenue laws and the provisions authorizing depletion allowance. Where the owner of the land retains an economic interest in the deposits, the transaction is regarded as a lease and the proceeds are taxable as ordinary income, subject, under certain conditions, to a deduction for depletion. Conversely, where the owner does not retain an economic interest, the transaction is regarded as a sale and, assuming that the transaction otherwise qualifies for capital gain treatment, the proceeds are taxable as capital gain.· The owner has retained an economic interest if he has acquired, by investment, any interest in the natural deposit in place, and has secured, by any form of legal relationship, income derived from the extraction of the deposit, to· which he must look for a return of his capital. The determination of whether an economic interest has been retained is not dependent upon the label that is given to the transaction by the parties or by the local law, nor is it dependent upon the owner's retention of title or any other particular form of legal interest in the deposit. Palmer v. Bender, 287 U.S. 551, 53 S.

Ct. 225, 77 L.Ed. 489 (1933); Gowans v. Commissioner, 246 F.2d 448 (9 Cir. 1957); 4 Mertens, Federal Income Taxation § 24.57 (1960).

By way of illustrating these principles, a transaction is not considered a sale where, for example, the transferor reserves a royalty of a percentage of the minerals to be produced, or where, in addition to reserving a royalty, he receives a cash bonus payment. Burnet v. Harmel, supra. Similarly, a sale does not occur where the transferor retains a right to royalty payments of stated amounts per unit mined and sold, with a provision for minimum payments, Bankers Pocahontas Coal Co. v. Burnet, 287 U.S. 308, 53 S.Ct. 150, 77 L.Ed. 325 (1932), affirming Strother v. C. I. R., 55 F.2d 626 (4 Cir. 1932), or a right to a share of the net profits from production, Burton-Sutton Oil Co v. Commissioner, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062 (1946), or where he receives a contemporaneous cash payment plus a right to a deferred payment of a specified sum of money payable solely from production, Thomas v. Perkins, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324 (1937). On the other hand, a transaction is regarded as a sale where, for example, payments can be made from future sales of the fee interest as well as from production, or where the transferee personally guarantees that an oil payment will equal the specified sum. See Anderson v. Helvering, 310 U.S. 404, 412–413, 60 S.Ct. 952, 84 L.Ed. 1277 (1940).

In the instant case the transaction between taxpayers and Brewster was simply an arrangement whereby Brewster was granted the right to excavate and remove earth fill in return for a royalty of a specified sum per unit of material taken. Under the principles stated this was not a sale within the meaning of the capital gains provisions.

Taxpayers make much of the designation of specific "cross-sections" of land from which the fill was to be excavated and of the provision purporting to require Brewster to excavate the initial cross-section containing 400,000 cubic yards of fill. We think taxpayers' reliance on these factors is misplaced for these reasons:

First: The requirement that Brewster take a minimum quantity of 400,000 cubic yards was subject to two important qualifications: (1) a reduction in Brewster's requirements under its contract with the New Jersey Highway Authority would reduce the minimum quantity accordingly, and, (2) Brewster was not required to take any material which did not meet the specifications of the Authority; thus the payments to taxpayers were dependent upon the actions and needs of the New Jersey Highway Authority.

Second: Even assuming that the contract imposed an absolute obligation upon Brewster to take a minimum of 400,000 cubic yards, the result would be analogous to a provision for minimum royalties or bonus payments and such a provision would not convert the transaction into a sale. See Bankers Pocahontas Coal Co. v. Burnet, supra; Burnet v. Harmel, supra; Otis A. Kittle, 21 T.C. 79, 87–88 (1953), aff'd, 229 F.2d 313 (9 Cir. 1956). The fact that the 400,000 cubic yards minimum was to be obtained from a specifically designated cross-section rather than from the land as a whole has no significance. Further, insofar as the presence or absence of an economic interest is concerned, neither the designation of a specific area from which the fill was to be taken, nor taxpayers' characterization of the transaction as a "sale of a cross-section of the land," [2] nor the use of the word "purchase" in the agreement between taxpayers and Brewster can serve to alter the hard realities of the situation. To rely on such factors would be to place form over substance.

In cases of this type "The facts of each transaction must be appraised to deter-

2. The quoted phrase is from taxpayers' brief.

mine whether the transferor has made an absolute sale or has retained an economic interest * * *." [3]

█ The sum total of the factual situation in the instant case is this: taxpayers owned land on which there was earth fill; they granted Brewster a contractual right to extract and remove some of it at a fixed unit price; Brewster did not contract to extract and remove *all* of the earth fill on taxpayers' property nor did it contract to extract and remove an absolute, inflexible *minimum* of the fill; and finally, the contract provided that Brewster was not required "to take or remove any material" which did not meet specifications of the Authority.

The legal result of this factual situation is this: there was no *sale* of the earth fill *in place;* taxpayers retained their economic interest in the earth fill prior to extraction; the payments made by Brewster for the extracted and removed fill, as the extractions and removals occurred, constituted ordinary income.

For the reasons stated the decision of the Tax Court will be affirmed.[4]

---

3. Kirby Petroleum Co. v. Commissioner, 326 U.S. 599, 606, 66 S.Ct. 409, 90 L.Ed. 343 (1946).

4. Taxpayers have cited several decisions from other Circuits. In two of them, Crowell Land and Mineral Corp. v. Commissioner, 242 F.2d 864 (5 Cir. 1957), and Linehan v. Commissioner, 297 F.2d 276 (1 Cir. 1961), the facts are not significantly different from those in the instant case; yet the courts there ruled in favor of capital gain treatment, relying primarily on factors which, in our opinion, do not warrant the significance that was attributed to them and accordingly we disagree with their holdings. In Crowell, stress was laid on the circumstance that the agreement was labelled "Contract of Sale" and contained such words as "vendor", "vendee", "sold and conveyed", and "full warranty of title"; and in both cases emphasis was placed on the fact that payments were based on fixed prices per unit of material taken rather than on resale price or market price. We have already pointed out the lack of significance

of the descriptive terminology used by the parties. Neither do we see any merit in the distinction based on fixed unit prices. Bankers Pocahontas Coal Co. v. Burnet, 287 U.S. 308, 53 S.Ct. 150, 77 L.Ed. 325 (1932), affirming Strother v. C. I. R., 55 F.2d 626 (4 Cir. 1932); Otis A. Kittle, 21 T.C. 79 (1953), aff'd, 229 F.2d 313 (9 Cir. 1956); Robert M. Dann, 30 T.C. 499, 509 (dissenting opinion); see Thomas v. Perkins, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324 (1937).

Other cases cited by taxpayers are either distinguishable on their facts from the instant case or in conflict with the principles that we consider controlling. Further, we note that Gowans v. Commissioner, 246 F.2d 448 (9 Cir. 1957), relied on by taxpayers, actually supports the Commissioner here. In holding the proceeds from the removal of sand from the taxpayers' property to be a capital gain, the court there laid great stress on the fact that the contract imposed an absolute obligation "to remove all of the sand" from the taxpayers' property.