Marvin **SHURBET** et ux., **Plaintiffs,**

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. A. No. 2701.**

United States District Court
N. D. Texas,
Lubbock Division.

Feb. 21, 1961.

DOOLEY, District Judge.

This cause came on for trial, and the Court, having heard the evidence and considered the stipulations of the parties, finds the facts and states the conclusions of law as follows:

*FINDINGS OF FACT*

*I. Procedural Facts*

1.1 At all pertinent times, Plaintiffs were husband and wife residing together at Route 1, Floyd County, near Petersburg, Texas.

1.2 This suit arises under the Constitution and laws of the United States, being a suit to recover an alleged overpayment of federal income taxes paid by plaintiffs to defendant and now questioned as having been erroneously and illegally assessed and collected by defendant.

1.3 Plaintiffs duly filed with defendant a joint income tax return for the Calendar Year 1959 and made timely payment to the defendant of the income tax shown to be due on said return, to-wit: $2,232.05. Thereafter, on June 17, 1960, plaintiffs filed with defendant a joint amended income tax return for the Calendar Year 1959 and paid to the defendant the additional tax shown therein to be due, to-wit: $1,830.62. The total income tax paid by plaintiffs for 1959 was the resulting sum of $4,062.67. Later plaintiffs paid to defendant an interest item of $18.89 on the additional tax due by said amended return. No part of any said payments has ever been refunded or credited to plaintiffs or otherwise allowed them.

1.4 Plaintiffs filed with the District Director of Internal Revenue a timely claim for the refund of income taxes for the year 1959. Exhibit 1 attached to the complaint in this case is a true copy of the claim for refund. On the 20th of October, 1960, Defendant sent Plaintiffs by registered mail a notice that said claim was disallowed in full.

1.5 The correctness of Plaintiffs' Federal Income Tax Return for 1959, as amended, is not in question in this case except for the issue raised by Plaintiffs' claim for refund.

*II. Capital Investment (Cost Basis)*

2.1 Plaintiffs' irrigation farm consists of 480 acres, of which 380 acres were purchased on August 8, 1946, for

$38,000.00 and 100 acres were purchased on January 23, 1953, for $28,000.00.

2.2 Plaintiffs have neither severed nor conveyed ownership of the surface or of the ground water beneath the 480-acre irrigation farm since the dates of acquisition of ownership thereof, and they are and have been the owners of the surface and of the ground water beneath the 480-acre irrigation farm since the said dates of acquisition.

2.3 Plaintiff Marvin Shurbet knew there were large quantities of water beneath the 380-acre tract and the 100-acre tract prior to the dates he purchased them in 1946 and 1953.

2.4 Since the advent of irrigation farming on the Southern High Plains [1] (hereafter sometimes referred to as SHP), in 1946 and 1953, specifically, the fair market values of dry lands (that is, lands which do not have any ground water or insufficient ground water beneath their surface with which to irrigate) have always been less than the fair market value of irrigated lands.

2.5 Plaintiff Marvin Shurbet knew of the difference in market value between dry and irrigated lands when he purchased the 380 acres in 1946 and the 100 acres in 1953; he was willing to pay such difference because of the ground water under the 480 acres, which he needed for his irrigation farming business.

2.6 Of the consideration paid by Plaintiff Marvin Shurbet in 1946 and in 1953 for the 380 acres and the 100 acres, Marvin Shurbet paid and intended to pay part of such consideration for irrigation water beneath such lands.

2.7 (a) The difference in value in 1946, between the land and improvements purchased by Marvin Shurbet in 1946 and land and improvements fully comparable thereto in all other respects but which did not have irrigation water beneath its surface, was $25.00 per acre.

(b) Of the $38,000.00 paid by Marvin Shurbet for the land purchased in 1946,

$9,500.00 ($25.00 per acre X 380 acres) was consideration for the acquisition of irrigation water.

(c) The difference in value in 1953, between the land and improvements purchased by Marvin Shurbet in 1953 and land and improvements fully comparable thereto in all other respects but which did not have irrigation water beneath its surface, was $120.00 per acre.

(d) Of the $28,000.00 paid by Marvin Shurbet for the land in 1953, $12,000.00 ($120.00 per acre X 100 acres) was consideration for the acquisition of irrigation water.

### III. Irrigation Farming

3.1 Plaintiffs are and at all pertinent times have been engaged in the business of farming of land owned by them in Floyd County, Texas, and in connection with this farming have irrigated their land.

3.2 Plaintiff Marvin Shurbet, in the year 1959, and for many years prior thereto, was engaged in the business of irrigation farming in the Southern High Plains.

3.3 The ground water contained in The SHP groundwater reservoir and beneath Plaintiffs' farm is fresh water suitable for human consumption, for stock watering, and for irrigation purposes.

3.4 A supply of irrigation water to a growing crop will substantially increase the yield of the crop and will result in more consistent production of good crops, provided that the irrigation water is applied during certain critical periods of time in the crop cycle.

3.5 The use of irrigation water in farming significantly improves the reliability and size of the yield of growing crops as compared to farming without the use of irrigation water, and the use of irrigation water directly causes increased income from farming.

3.6 During 1959, Marvin Shurbet derived income from the sale of crops

---

1. See Finding of Fact 4.1 for description of boundaries of the Southern High Plains.

raised by him by irrigation farming in 1959.

3.7 During 1959, Marvin Shurbet used irrigation water in his business of irrigation farming for the purpose of producing income and such use produced income in 1959.

3.8 The irrigation water so used by Marvin Shurbet in 1959 for the production of income was ground water drawn by Marvin Shurbet from the Southern High Plains ground-water reservoir by means of irrigation wells from beneath said farm lands owned by him.

3.9 During 1959, Marvin Shurbet pumped ground water on his crops approximately as follows:

| Crop | Acreage | Amount of Ground water (inches) | Acre-Feet Pumped Minimum-Maximum | |
|------|---------|--------------------------------|------------------|------------------|
| Cotton | 140 | 15 – 18 | 175 | 210 |
| Grain Sorghum | 55–70 | 15 – 18 | 70 | 105 |
| Wheat | 155 | 11 – 13 | 143 | 169 |
| Alfalfa | 45–50 | 11 – 13 | 43 | 52 |
| Corn | 45–50 | 15 – 18 | 50 | 75 |
| | | TOTALS | 481 | 611 |

3.10 Marvin Shurbet's farming operations in 1959 were and are typical of the farming operations of farm owners and operators engaged in the business of irrigation farming in the Southern High Plains.

3.11 Present pumping practices of farm owners and operators engaged in the business of irrigation farming in the Southern High Plains are, and for many years have been, to pump all of the ground water they can get, or all the ground water that they think they need for their crops, whichever is less.

3.12 Plaintiffs' farm income in 1959 was dependent on production from their farm, which in turn was dependent on the ground water they extracted from beneath their farm and used in their business of farming.

## IV. Geology

4.1 For purposes of these Findings of Fact, the term "Southern High Plains" means that area of Texas and New Mexico south of the Canadian River and east of the Pecos River, the boundaries of which are substantially similar to the boundaries delineated by the boundary lines on Exhibit S-12 as "Boundaries of the Ogallala Formation South of the Canadian River."

4.2 The Southern High Plains is a plateau, covering an area of approximately 35,000 square miles (approximately 22 million acres), which stands high above the surrounding countryside; it is about 150 miles wide from west to east and 200 miles wide from north to south; Plaintiffs' farm is located in the Southern High Plains.

4.3 Within the Southern High Plains plateau is a geologic formation known as the Ogallala formation which contains underground water in significant quantities. The Ogallala formation also occurs outside of the Southern High Plains, but all references in these Findings to the Ogallala formation are references solely to the Ogallala formation in the Southern High Plains.

4.4 The Ogallala formation in the Southern High Plains consists of a layer or stratum composed of interbedded layers of quartz, sand, pebbles, silt, gravel, water, clay, rocks and other materials; some of these materials are water-bearing, that is, the void spaces between the particles of material contain water. The

water in the Ogallala formation is of a type termed by hydrologists as "ground water". The materials which compose the Ogallala formation are permeable, that is, water can move through the materials. There has been water in the formation since it was deposited millions of years ago.

4.5 Over a long period of time, during Pliocene times (from one to ten million years ago) streams flowing generally from the Rocky Mountains, from the west toward the east, deposited the materials which make up the Ogallala formation; rocks, sand, gravel, silt, silty clays and combinations of these materials and water.

4.6 Thereafter, some of the Ogallala formation was eroded away; the Canadian River carved out a valley to the north; the Pecos River turned south and carved out a valley to the west.

4.7 The boundaries of the Southern High Plains today (and of the Ogallala formation in the Southern High Plains) are: The escarpment (steep cliff) cut by the Canadian River on the north, the escarpment cut by the Pecos River on the west, an escarpment on the east; on the south the Ogallala formation slopes southeastward into older formations (the Edwards Plateau) which lie at a lower elevation.

4.8 Underlying the entire Ogallala formation in the Southern High Plains are rocks laid down in the Triassic and Permian geologic time periods, which rocks are referred to as "red beds"; the red beds are several thousand feet thick and are relatively impermeable (as is, for example, a wooden table) and thus the red beds form a bottom or basin for the water in the Ogallala formation, and the water does not percolate downwards to any appreciable degree. The red beds exist through the entire area below the Ogallala formation in the Southern High Plains.

4.9 Below the Ogallala the geologic formations are, in general, non-water bearing or contain limited supplies of fresh or salty water. These formations are the Cretaceous, the Triassic, and the Permian.

(a) The Cretaceous system contains small supplies of water which may be of local importance, but is not considered as a significant source of water on the SHP.

(b) The Triassic system has limited water supplies, most of which are salty and unsuitable for irrigation or domestic use.

(c) The Permian system does not yield fresh water.

4.10 The thickness of the Ogallala formation in the Southern High Plains ranges from a few feet to several hundred feet.

4.11 The land surface of the Southern High Plains plateau has a relatively imperceptible slope. In general, both the land surface and the bottom of the Ogallala formation in the Southern High Plains slope from northwest to southeast at an average rate of about 10 feet per mile.

4.12 The bottom of the Ogallala formation in the Southern High Plains is about 2,400 feet above sea level on the southeast and about 4,400 feet above sea level on the northwest. The elevation above sea level is about 3,200 feet at Lubbock and about 3,600 feet at Amarillo.

4.13 The bottom of the Ogallala formation in the Southern High Plains plateau generally rises above the surrounding countryside.

4.14 The Ogallala formation in the Southern High Plains is isolated from movement of new water into the formation (except for precipitation upon the surface of the ground above the Ogallala formation) because the bottom of the Ogallala formation is underlain by relatively impermeable red beds, and the bottom of the Ogallala formation generally rises above the surrounding countryside so that the Ogallala formation in the Southern High Plains is isolated by air.

4.15 The only source from which new water of any kind can move into the Ogallala formation in the Southern High

Plains is from precipitation upon the surface of the ground.

### V. Hydrology

5.1 Hydrology is the science dealing with the study of the waters of the earth.

5.2 Water accumulates and moves in a hydrologic cycle. The sources of water are: precipitation (rain and snow) which falls on the surface of the ground and water moving laterally, above-ground or below-ground. Water is dissipated in several ways:

(1) Evaporation (both above and below ground)

(2) Transpiration (absorption by plants)

(3) Recharge into the zone of saturation (the zone of saturation is the underground area containing water-bearing material from which water can be artificially extracted; recharge is the amount of water which enters the zone of saturation).

(4) Run-off, both above and below the land surface.

5.3 The top of the zone of saturation is called the water table. The distance from the water table to the bottom of the zone of saturation is the saturated thickness of the water-bearing material. The saturated thickness of the Ogallala formation in the Southern High Plains is the area between the water table and the red beds (the bottom of the Ogallala formation).

5.4 *Precipitation:*

(a) Precipitation on the SHP is irregular and annually averaged approximately 20 inches between 1890 and 1960.

(b) In those years when rainfall is below average, there is little opportunity to recharge the reservoir. The opportunity for recharge is increased in those years when the rainfall is above average or falls within concentrated periods of time.

5.5 *Evaporation and Transpiration:*

(a) More than 99% of the approximate 20 inches of average annual precipitation is evaporated or transpired. This is because approximately 75% of the precipitation falls on the SHP in the six months from April through September, during which time there is the greatest plant growth and transpiration. The high temperatures, low humidity, low atmospheric pressure, and strong winds during these six months of April through September also increase evaporation and reduce the opportunity for recharge to the Ogallala formation.

(b) Potential evaporation and transpiration on the SHP is greater than the average annual rainfall on the SHP.

(c) Annual evaporation from evaporation pans set out on the SHP averages 70 to 80 inches.

5.6 *Run-Off:*

There is little stream run-off from the surface of the SHP, except during periods of concentrated precipitation. The negligible amount of water loss from stream run-off is primarily due to the slight slope of the surface of the SHP, the lightness and irregularity of the rainfall, the absorption of the precipitation in sandy soil areas and sand dune areas, and in the collection of water in playa lakes in the "tightlands" areas of the SHP.

5.7 *Surface variations (playa lakes):*

Playa lakes are the primary surface variations on the SHP. There are thousands of these lakes or depressions dotting the SHP, particularly in the northern part of the SHP. When there is precipitation of sufficient intensity and duration, some of the precipitation runs off into the playa lakes. Ordinarily, playa lakes are dry most of the time. Perhaps 90% of the water that collects in playa lakes evaporates; the remainder eventually reaches the Ogallala groundwater reservoir as recharge.

5.8 *Surface and underground materials:*

(a) The depth from the surface of the SHP to the water table ranges from less than 50 feet to more than 250 feet.

(b) Much of the SHP surface is underlain with caliche and where indurated is a relatively impermeable material

which ranges from a few feet to more than 150 feet. Indurated caliche retards the downward movement of water; thereby increasing the potential rate of evaporation and transpiration and correspondingly decreasing recharge to the Ogallala reservoir.

(c) Sand hill areas on the SHP are favorable to recharging the Ogallala reservoir. Sand hill areas, as a whole, are relatively small when compared to the entire surface area of the SHP.

(d) Sandy-soil areas comprise approximately 50% of the SHP and are conducive to recharging the Ogallala reservoir. Most of the sandy-soil area is in the southern portion of the SHP, which receives less rainfall on the average than the "tightlands" areas located in the northern portion of the SHP.

(e) The "tightlands" areas have clayey subsoils that retard the penetration of rainfall and cause run-off into playa lakes where the opportunity for evaporation is greatest.

5.9 *Soil moisture and capillarity:*

Soil moisture is water held by capillary forces in the interstices of the soil between the surface of the ground and the water table. Soil moisture near the surface either evaporates or is transpired by plants and must be replaced by sufficient water to satisfy the capillary actions before any water can percolate through to the water table.

5.10 The State of Texas has designated the SHP in Texas to be a ground-water reservoir and has created the High Plains Underground Water Conservation District No. 1, with jurisdiction over a sub-division of the reservoir. Such sub-division includes those areas within thirteen counties which have elected to come into the Water District. Floyd County, wherein Plaintiffs' farm is located, elected to come into the Water District.

5.11 *Types of Aquifers:*

(a) An artesian-conduit aquifer (or confined aquifer) is an aquifer which is confined under hydrostatic pressure between two relatively impermeable beds, and in which the water level in a well drilled in the aquifer will rise above the top of the aquifer.

(b) A water-table aquifer (or unconfined aquifer) is one in which the water is not confined between two impervious layers and in which the water level in a well drilled in the aquifer reflects the general level of the water table throughout the aquifer.

(c) An artesian-conduit type aquifer can only receive recharge at the outcrop (that is, the area on the surface between the points at which the impervious layers crop out) and cannot receive recharge from the surface where it underlies the impermeable cover. A water-table reservoir type aquifer may receive recharge through the entire extent of the aquifer. Generally, an artesian aquifer is a conduit aquifer, and a water-table aquifer is a reservoir aquifer.

(d) The Southern High Plains ground-water reservoir is a water-table aquifer, in which the water level in wells stands at the level of the water table of the aquifer (the top of the zone of saturation).

5.12 *Movement of Ground Water:*

(a) Ground water in the saturated section of the Ogallala reservoir responds to gravity and moves through the interstices of the permeable materials away from areas of high pressure (recharge areas) and in the direction of areas of low pressure (discharge areas). Ground water moves in a stream-line and follows a flow pattern.

(b) Permeability is the ease with which a particle of water moves through the aquifer. The average permeability of the Ogallala formation is approximately 400 gallons per day per square foot.

(c) The slope of the water table is called the hydraulic gradient. The hydraulic gradient of the Ogallala formation averages 10 feet per mile. The water table in the Ogallala formation slopes from the northwest to the southeast. Therefore, the general direction of movement of water through the Ogal-

lala reservoir is from the northwest to the southeast.

(d) The average rate of movement (velocity) of ground water through the Ogallala reservoir is in the order of 60 feet per year (2 inches per day) to 200 feet per year.

5.13 *Quantity of Ground Water:*

(a) *Porosity* is the total amount of void spaces in a saturated thickness of solid material. Porosity is expressed as a percentage of the total volume of the saturated thickness. The average porosity for the Ogallala formation is 30%.

(b) *Specific Yield* is the total amount of water in the saturated thickness that will drain out by gravity, which is also the amount of water that can be pumped out by irrigation wells. Specific yield is expressed as a percentage of the total volume of the saturated thickness. The average specific yield for the Ogallala formation is 15%.

(c) *Specific retention* is the total amount of water that will not drain out by gravity and cannot be pumped out by irrigation wells. The water that is so retained is held by surface tension or molecular attraction, commonly called capillary action. Specific retention is expressed as a percentage of the total volume of the saturated thickness. The average specific retention for the Ogallala formation is 15%.

(d) The specific yield, or recoverable water, in storage in the entire Ogallala formation in the SHP in 1938, 1958, and 1962 was approximately as follows:

| Year | Recoverable Water in the Ogallala Reservoir |
|------|---------------------------------------------|
| 1938 | 250 million acre-feet |
| 1958 | 220 million acre-feet |
| 1962 | 210 million acre-feet |

5.14 *Dynamic Equilibrium:*

(a) A water-table reservoir type aquifer, such as the Ogallala reservoir, under natural conditions (prior to pumping) is in a state of dynamic equilibrium; that is, average annual natural recharge is approximately equal to the average annual natural discharge.

(b) Artificial withdrawals (pumping) from an aquifer in dynamic equilibrium will result in one or more of the following:

(1) *an increase in natural recharge*—this occurs only if the water table is close to the surface and there is rejected recharge, that is, potential recharge near the land surface which has been rejected by the reservoir because it is full at that point; pumping lowers the water table and permits some of the theretofore rejected recharge to enter the reservoir; however, there are no longer any areas on the SHP where there is rejected recharge; consequently, there are no areas on the SHP today where pumpage withdrawals cause an increase in natural recharge.

(2) *a decrease in natural discharge*—pumping has slightly reduced discharge; it is not possible to decrease discharge by pumping without also drawing water from storage. Furthermore, such natural discharge can be salvaged only in the areas where it occurs, principally along the eastern edge of the escarpment.

(3) *extraction of water from storage*—except for a slight amount of water resulting from a reduction in natural discharge, all of the pumpage is being withdrawn from storage.

(c) Although there has been a slight decrease in natural discharge from the SHP ground-water reservoir as the water table has declined, for all practical purposes, the average annual natural recharge to the reservoir still approximately equals average annual natural discharge.

5.15 *Natural Recharge:*

(a) The ground water in the Southern High Plains ground-water reservoir is not replenished from land areas outside the boundaries of the reservoir and is isolated from replenishment except for replenishment from seepage downward from the surface of the ground within such boundaries.

(b) Average annual natural recharge is the average amount of water that en-

ters the ground-water reservoir from the surface of the ground from precipitation, that is, the amount of precipitation which is not lost by surface run-off, evaporation, or transpiration, and which enters the ground-water reservoir.

(c) A study of the Southern High Plains ground-water reservoir undertaken for the purposes of this case resulted in the conclusion that the average annual recharge to the ground-water reservoir prior to 1938 was approximately $\frac{13}{100}$ of an inch per year.

(d) A study by hydrologist W. L. Broadhurst of the SHP ground-water reservoir over a period of 24 years resulted in his conclusion that the average annual recharge to the ground-water reservoir is approximately $\frac{3}{20}$ of an inch per year.

(e) The recurring recharges in the Ogallala formation of the SHP do not occur regularly, year after year, but only intermittently, and same vary in amount from time to time, the greatest recharge having been from the unprecedentedly heavy rains of 1941 and was in the order of about 5 or 6 inches, with much of the recharge spread over two or three years, and both before and since then the ordinary area average annual recharge (averaging all of the wet and dry years) has been in the order of $\frac{3}{20}$ths to $\frac{1}{2}$ inch in amount.

### 5.16 *Natural Discharge:*

(a) Natural discharge is the quantity of water that is discharged from the ground-water reservoir through natural processes. Along much of the eastern escarpment of the SHP there are hundreds of seep areas and springs where ground water is discharged from the SHP ground-water reservoir.

(b) Most of the natural discharge is along the base of the eastern escarpment, but there is a small amount of discharge along the major streams in the northern part of the SHP area; there are natural discharge points in the bottom of large alkali lakes in the southern part of the SHP.

(c) In times past, ground water also escaped from the Southern High Plains ground-water reservoir by evaporation and transpiration through plants in areas where the water table was at or near the surface. Due to the decline of the water table in recent years, such evaporation and transpiration cannot occur at the present time.

(d) A study over a period of 24 years by hydrologist W. L. Broadhurst of the SHP ground-water reservoir resulted in his conclusion that the average annual discharge from the ground-water reservoir is approximately $\frac{3}{20}$ of an inch per year.

### 5.17 *Increase in the Number of Wells:*

(a) Since 1934, the number of wells pumping water from the Ogallala reservoir has increased as follows:

| Year | Number of Wells |
|------|-----------------|
| 1934 | 620 |
| 1948 | 8,000 |
| 1958 | 47,000 |

(b) The area within which the most intensive increase in wells has occurred is within Sub-Division No. 1 of the reservoir. Boundaries of said Sub-Division No. 1 are shown on Exhibit P–9.

(c) Since 1934, the average annual pumpage in the SHP has increased from several hundred thousand acre-feet to more than 5 million acre-feet in 1960.

(d) From 1934 to 1958, the development of wells in Floyd County and within a ten-mile radius of Observation Well No. 554 on Plaintiffs' farm closely parallels the development of wells over the entire SHP.

(c) During the taxable year 1959, Plaintiffs had five irrigation wells, one domestic well, and one windmill well in operation and drawing water from the Ogallala reservoir from beneath their farm.

(f) During the taxable year 1959, Plaintiffs pumped approximately 450 to 650 acre-feet of water from the Ogallala

744

reservoir beneath their farm for the production of crops and income.

5.18 *Decline of the Water Table:*

(a) Except for isolated variations in a few individual wells, from 1938 to 1958 there has been an increasing, substantial, and generally uniform decline in the water table in the Southern High Plains ground-water reservoir.

(b) From 1938 to 1958, the most substantial decline in the water table in the Ogallala ground-water reservoir has occurred within the area which is Sub-Division No. 1 of the reservoir.

(c) The decline of the water table in the Ogallala ground-water reservoir is almost in direct proportion to the increase in wells—the more concentrated the wells in an area, the greater the decline in the water table.

(d) United States Geological Survey measurements show the water table under Plaintiffs' farm declined 56.46 feet between March, 1947, and December, 1961, and 5.90 feet between January 1, 1959, and January 1, 1960.

(e) The decline of 5.90 feet in the water table and the saturated thickness represents a net loss of between 425 acre-feet (if 15% specific yield is assumed) and 566 acre-feet (if 20% specific yield is assumed) of ground water from beneath Plaintiffs' farm in 1959. Such loss is the result of extraction of ground water by Plaintiffs for use in their business of farming in 1959.

5.19 *Decline of Saturated Thickness:*

(a) From 1938 to 1958, the saturated thickness of the Ogallala formation has declined substantially and generally.

(b) From 1938 to 1958, the most substantial decline in the saturated thickness of the Ogallala ground-water reservoir has occurred within the area of Sub-Division No. 1 of the reservoir within which area the greatest number of wells are located.

5.20 *Exhaustion:*

(a) Ground water in the SHP ground-water reservoir is being "mined" in the sense that artificial discharge from wells takes water from storage.

(b) Ground water in the SHP ground-water reservoir is in general, and under Plaintiffs' farm in particular, a non-renewable resource. Once drained, the SHP ground-water reservoir will require more than 4000 years to refill and will be lost insofar as Plaintiffs and immediately succeeding generations are concerned.

(c) The ground water in the Ogallala reservoir is being exhausted. If present pumping practices continue (that is, if farmers pump all the ground water they can get or all the ground water they think they need), and if economic considerations do not intervene, the Ogallala reservoir will be exhausted.

(d) A great number of unsuccessful experiments have been conducted in the SHP to artificially recharge the ground-water reservoir. At the present time there is no known practical or successful method of artificially recharging the Ogallala reservoir and none is now in view by reasonable foresight.

(e) As physical exhaustion of the Ogallala reservoir approaches, the yield of irrigation wells declines at a constantly increasing rate. Farmers under these circumstances have resorted to agricultural techniques which use less water, such as irrigating every other row. The increased cost of extraction and the decreased yield will eventually make further irrigation farming impractical, depending upon the circumstances in each case.

VI. *Mineral and Mineral Deposits*

6.01 Ground water in the Ogallala formation of the Southern High Plains is a mineral and a natural deposit within the meaning of the federal tax statutes and regulations governing deductions for cost depletion.

6.02 *Movement and Replenishment:*

(a) Many minerals and mineral deposits are regularly in motion in nature. Those mineral deposits can be divided into two classes:

Class I—mineral deposits wherein the mineral constituents occur as liquids or gases and are therefore inherently mobile. Examples of this first class are oil

and gas, brines, and hydrogen sulfide gas.

Class II—mineral deposits wherein the entire mineral aggregate moves under natural forces, such as gravity and hydraulic forces. Examples of this second class are placer deposits.

(b) Oil and gas are inherently fugacious and do not become so only after being tapped by man.

(c) Many minerals and mineral deposits are regularly replenished in nature.

### VII. Measurement of Depletion

7.1 Plaintiffs computed their deduction for depletion by multiplying their cost basis (capital investment) in their ground water by a fraction, the numerator of which is equal to the decline in the water table during 1959 and the denominator of which is equal to the expected total decline of the water table.

7.2 *Decline of Water Table:*

(a) In a water-table reservoir type aquifer, such as the Ogallala ground-water reservoir, the water table and the static water level in wells are the same. Thus, measurements of the static water level will reflect the decline of the water table. As the water table is the top of the saturated thickness of the Ogallala ground-water reservoir, the annual measurements of the static water levels will also reflect the decline of the saturated thickness of the Ogallala ground-water reservoir.

(b) The United States Geological Survey has established and has maintained since prior to 1938 a system of measuring static water levels in observation wells in the SHP. Observation Well No. 554 is located on Plaintiffs' farm. Records of measurement of the water levels in Observation Well No. 554 and other observation wells are kept and published by the USGS. Observation Well No. 554 and other observation wells are measured each year prior to the beginning of the pumping season.

(c) Measurement of the decline of the water table is the most practical, accurate, and reliable method known to hydrologists for measuring loss of storage from the Ogallala ground-water reservoir.

(d) Some ground water pumped to the surface for irrigation is neither evaporated nor transpired by the plants nor retained as soil moisture in the unsaturated section of the Ogallala formation, and hence returns to the underlying saturated section of the formation. This ground water is sometimes referred to as recirculated or recycled ground water. The best and most reliable estimates are that such recycled ground water amounts approximately to 15 to 31 percent of the water pumped on the Southern High Plains. This recycled ground water returns down to the reservoir. Measurements of the static water level taken prior to the beginning of the pumping season reflect the net loss of water from storage, since such static water level is measured after there has been recovery from any temporary factors (as distinguished from permanent loss of water) which affect the static water level.

(e) The water table and the saturated thickness under Plaintiffs' farm declined 5.90 feet between January 1, 1959, and January 1, 1960, which decline was the result of the extraction by Plaintiffs of ground water for use in 1959 in their business of irrigation farming.

(f) The saturated thickness under Plaintiffs' 380 acres at the time of purchase in 1946 was 342 feet.

(g) The saturated thickness under Plaintiffs' 100 acres at the time of purchase in 1953 was 332 feet.

(h) In 1959 Plaintiffs' depletion amounted to 5.90/342 of their $9,500 cost basis in the ground water beneath the 380-acre tract and 5.90/332 of their $12,000 cost basis in the ground water beneath the 100-acre tract.

(i) Plaintiffs are entitled to a depletion deduction for the taxable year 1959 of $163.90, with respect to the 380-acre tract, and $213.29, with respect to the 100-acre tract, for a total cost depletion deduction of $377.18.

(j) The allowance of the said depletion deduction would reduce the Plaintiffs' income tax liability for 1959 by the amount of $113.16. Plaintiffs have overpaid their Federal Income Tax for 1959 by $113.16.

## VIII. *Tritium*

8.1 Tritium is a beta radioactive hydrogen isotope. In nature it is generated by the action of cosmic rays in the upper atmosphere. Thermonuclear blasts, notably that of 1954, are a new source of plentiful tritium emissions which have upset the pre-existing level of tritium, at least in the northern hemisphere. It decays by halves into helium over successive intervals of about 12.25 years. The first scientific knowledge of tritium came twenty to twenty-five years ago. The standard unit of tritium is signified as T U. The pre-existing level of tritium in the world before the onset of the nuclear fallouts had never been directly established. Scientists undertook to determine the unknown pre-1954 level indirectly by testing with pre-1954 bottled waters, such as liquors, and have generally agreed on a finding of about 7 T U. The theory is that a tritium content less than 7 T U indicates old water and a tritium content greater than 7 T U indicates new water. The water dating utility of tritium, however, is still short of a perfected procedure, particularly in the instance of ground water. One study indicates that tritium may have a tendency to range more or less in a gradation pattern of layers. At any rate, in taking ground water samples from wells for tritium counting very competent supervision is needed. A slight contamination may cause great distortion in result. Another point is that sampling of ground water to be done with the best technique requires geologic and hydrologic correlation. The eighteen samples of ground water here pertinent were taken in a rather haphazard way and the procedure varied from the better practice in the above and also other respects. The main point apparently that government counsel sought to make in the examination of the chemist witness Pro was that in his analysis and testing of said samples, he did not find any water over seventy-five years old, but at the same time made it plain that he was unable to say there was none older in the full body of water. The outcome of said testing of water from such a relatively few and rather concentrated wells is not a dependable guide in estimating age of the water generally in the water bearing Ogallala formation of the SHP.

## IX. *Conclusion of Law*

9.1 In view of the foregoing findings of fact and the Court's letter memorandum of decision dated January 11, 1963, it follows in point of law that the Plaintiffs are entitled to judgment against the Defendant to recover a refund of taxes, together with proper interest, on the basis of the cost depletion deduction herein sustained by the Plaintiffs.

It is so ordered, and counsel for the Plaintiffs will submit appropriate judgment in accordance herewith.