Don C. Day and Catherine Day, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Dan Day and Roberta Day, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 3968–68, 3978–68.    Filed June 25, 1970.

*Clarence P. Brazill, Jr.*, for the petitioners.
*John W. Dierker*, for the respondent.

1420

OPINION

The parties are in general agreement that the principles developed in the field of oil and gas taxation govern the resolution of the issue presented for decision—whether the lump-sum payments received by petitioners on the execution of their contracts with Pan American are taxable as capital gains or as ordinary income. Defining those principles is not nearly as difficult as applying them to the present facts. One reason, aside from the difficulties inherent in the problem, is that some of the features of the agreements involved herein are foreign to the form of customary oil and gas transactions. Nevertheless, we think that the principles of oil and gas taxation are the most helpful analogies available in deciding the present controversy. Cf. G.C.M. 22730, 1941–1 C.B. 219.

It has long been established that where a mineral interest is assigned for a lump-sum cash consideration (usually described as a "bonus") and the assignor retains a royalty,[3] the transaction is a lease—under which payments are taxable as ordinary income, like rents—rather than a sale of captial assets. *Burnet* v. *Harmel*, 287 U.S. 103, 107–108 (1932). Similarly, a lease rather than a sale occurs where the assignor, in addition to receiving a cash bonus, retains a determinate interest such as a production payment[4] plus a continuing interest such as a royalty. *Palmer* v. *Bender*, 287 U.S. 551 (1933). In both of these situations the cash consideration is regarded as an advance royalty (thus reducing the assignor's royalty share of future production) and is taxable as ordinary depletable income. See *Herring* v. *Commissioner*, 293 U.S. 322, 324 (1934) ; *Murphy Oil Co.* v. *Burnet*, 287 U.S. 299 (1932) ; *Burnet* v. *Harmel*, *supra* at 111–112. The assignor is deemed to have conveyed to the assignee merely exclusive exploitation privileges and in the initial transaction has not parted with his capital interest in the mineral. G.C.M. 22730, *supra* at 216.

---

[3] A royalty is "a right to receive a specified percentage of all oil and gas produced," *Anderson* v. *Helvering*, 310 U.S. 404, 409 (1940), which right will last for the entire term of the property interest assigned. *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, 262 fn. 1 (1958).

[4] A production, or oil, payment is a "right to a specified sum of money, payable out of a specified percentage of the oil, or the proceeds received from the sale of such oil, if, as and when produced." *Anderson* v. *Helvering*, *supra* at 410.

In contrast, where mineral rights are assigned for a cash consideration, and no interest is reserved, or the only interest reserved is a production payment or a "vertical" fraction, the transaction is a sale of a capital asset (or of section 1231, I.R.C. 1954, property). In such cases the gain included in the cash payment is taxable as capital gain. *Commissioner* v. *Fleming*, 82 F. 2d 324 (C.A. 5, 1936), affirming 31 B.T.A. 623 (1934); *Howard Glenn*, 39 T.C. 427, 443 (1962); see *Hammonds* v. *Commissioner*, 106 F. 2d 420, 425 (C.A. 10, 1939), reversing on another issue 38 B.T.A. 4 (1938); G.C.M. 22730, *supra* at 217–218. The theory is that the cash payment is unrelated to the production of the mineral, and instead is consideration for the assignor's transfer of all of his interest except the fraction thereof reserved. *Commissioner* v. *Fleming*, *supra* at 327; *Howard Glenn*, *supra* at 443. Indeed, since no right to royalties is retained, the cash payment cannot be considered an advance royalty.

The distinction between a sale and a lease, therefore, turns principally on the type of interest retained by the assignor. See *Dingman* v. *United States*, 303 F. Supp. 110, 111 (D. Minn. 1969). The type of retained interest involved in the first two situations described above is generally referred to as an "economic interest" in the mineral in place. As defined by the Supreme Court in *Palmer* v. *Bender*, *supra* at 557, an economic interest exists in—

every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital.

Accord, sec. 1.611–1(b), Income Tax Regs. This definition was amplified in *Commissioner* v. *Southwest Expl. Co.*, 350 U.S. 308, 314 (1956), where the Court stated that the second prong of the economic interest test is satisfied only if "the taxpayer must look *solely* to the extraction of oil or gas for a return of his capital." (Emphasis in original.)

We have concluded that the lump-sum cash consideration received by petitioners on the execution of the Pan American contracts represents the proceeds of the sale of capital assets rather than ordinary income. Under these contracts Pan American acquired the right to *all* of the water underlying petitioners' lands; it intended to withdraw that water, and, under the peculiar facts, could do so within the stated 25- or 45-year periods. The amount of the consideration, paid at the time the contracts were signed, was fixed by the terms thereof and was in no way dependent on the fact or amount of the future production or extraction of the water. Neither by the terms of those contracts nor by virtue of any collateral fact did petitioners retain an economic interest in the water in place which disqualifies the lump-sum payment from treatment as capital gain.

Respondent contends that petitioners retained an economic interest in the water in place because (1) they reserved rights to receive up to 100 barrels of water per day and (2) they retained a reversionary interest in the water. This latter contention is grounded on respondent's assertions that Pan American cannot withdraw all of the water within the 25- or 45-year periods because the subterranean movement of water beneath adjoining properties will replenish the underground reservoir, and that petitioners have not shown that all of the water will, in fact, be withdrawn. We disagree.

Petitioners' reservation of rights to 100 barrels of water per day is quite obviously insufficient to determine the character of the entire transaction. Pan American's wells on section 35 were producing 15,000 barrels per day compared with Don's right to receive 100 barrels daily. And the evidence shows that Don was drawing a maximum of 36 barrels per day for 120 days each year, or 12 barrels per day on an annual basis. Since no wells had been drilled on Dan's property at the time of the trial, his reserved water rights had not yet ripened, but they will not exceed those of Don. The reserved rights are obviously *de minimis* when compared with the rights conveyed to Pan American.

As noted above, moreover, under the principles of oil and gas taxation, the disposition of a "vertical" fraction of a mineral interest may produce capital gain even though the remaining fraction is reserved for the productive life of the property. See *Commissioner* v. *Fleming*, *supra*; *Howard Glenn*, *supra*. But even more pertinent to the present case, Rev. Rul. 55–295, 1955–1 C.B. 373, holds that capital gain may be realized on the disposition of water rights even though the grantor—

reserves the right to use only so much of the water in, under and upon the premises as may be necessary to drill for and produce oil, gas and other minerals, and further reserves the right to use such water for the purpose of normal farming and ranching operations and domestic use but not for irrigation purposes.

Petitioners' reserved water rights were much less extensive than those reserved by the taxpayer in that revenue ruling and certainly do not rise to the dignity of the "paramount rights" referred to in *Puckett* v. *Commissioner*, 355 F.2d 551 (C.A. 5, 1966), affirming per curiam a Memorandum Opinion of this Court, discussed *infra*.

As for respondent's argument that the reservoir beneath petitioners' properties will be replenished by water underlying adjoining properties, its oil and gas analog was first made, and rejected, in *United States* v. *Ludey*, 274 U.S. 295, 303 (1927):

It is argued that, because oil is a fugacious mineral, it cannot be known that the reserve has been diminished by the operation of wells. Perhaps some land may be discovered which, like the Widow's cruse, will afford an inexhaustible supply of oil. But the common experience of man has been that oil wells, and the

territory in which they are sunk, become exhausted in time. Congress in providing for the deduction for depletion of oil wells acted on that experience. * * *

More pertinent, this same argument was made in *United States* v. *Shurbet*, 347 F.2d 103 (C.A. 5, 1965), affirming 242 F. Supp. 736 (N.D. Tex. 1961), where the issue was whether deductions for cost depletion in respect of ground water extracted from the Ogallala formation were allowable. The District Court had found that the ground water was being "mined," that it was a nonrenewable resource, and that it was being exhausted. 242 F.Supp. at 744. The Government attacked these findings, insisting that the taxpayers did not have an ownership interest in the water which was being pro tanto exhausted as the water was pumped and had not shown that their capital investment was being diminished by pumping water from beneath the land. The Court of Appeals rejected the Government's arguments, saying:

In Texas the common law rule prevails that the owner of the land owns the soil and the percolating water which is a part of the soil. [Citation omitted.] More specifically, a Texas statute has recognized that the ownership of underground water in the Ogallala formation is vested in the owners of the land. [Citation omitted.] The careful and thorough evidentiary development of the taxpayers' case furnished ample support for each of the findings of the district court. [347 F.2d at 106.] [5]

While *Ludley* and *Shurbet* involved depletion, we think their reasoning is apposite.[6] We see no reason why the possibility that water underlying other properties may flow into the reservoir under petitioners' lands should alter the character of the transaction any more than the possibility that an underground oil reserve will be replenished by the subterranean movement of oil.

The present contracts are not analogous to conveyances carving production payments out of larger interests, such as those in *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260 (1958), and *United States* v. *Foster*, 324 F. 2d 702 (C.A. 5, 1963). Each of the cited cases involved a production payment in a specified amount payable over a period less than the life of the property interest from which it was carved. The courts found that the substance and effect of such transactions was a substitute of a lump-sum payment for future income rather than a conversion of a capital asset.

In contrast, the present contracts conveyed to Pan American the rights to *all* of the water underlying the subject properties and reserved

---

[5] The facts regarding the geological and hydrological characteristics of the Ogallala formation, recited in our findings, were stipulated by the parties and are essentially identical to the findings of the District Court in *Shurbet*.

[6] See *Wood* v. *United States*, 377 F. 2d 300, 305 (C.A. 5, 1967), certiorari denied 389 U.S. 977 (1967) : "the test for determination of whether proceeds are taxable as capital gains or ordinary income is the same as that for determining whether proceeds are subject to depletion.12" (Footnote omitted.) See also *Anderson* v. *Helvering, supra* at 407–408.

none of it to petitioners. It was for all of the water—nothing less, nothing more—that Pan American paid, and petitioners received, the lump sums of $56,000 each. We have the uncontradicted testimony of petitioners' expert witness that Pan American will require at least 110 million barrels of water to waterflood its oil field; the reservoir underlying the southeast quarters of sections 5 and 35 contained only 30 million barrels of water at the time the contracts were made. And Pan American expressed the intent to extract all of the water.[7] Therefore, no substantial rights to the water were reserved by petitioners.

Respondent's reliance upon *Puckett* v. *Commissioner, supra*, is misplaced. The agreement involved in that case bore the following characteristics of a lease, none of which are present here: The consideration was payable in fixed annual sums—having no relation either to the amount of water produced or to the value of the water available for extraction—much like rental payments under a lease of realty; the assignee could terminate the agreement at the end of any year without further obligation to the assignor; and "there was no substantial initial payment, a common characteristic of a sale." [8] Indeed, the *only* consideration received by the present petitioners was a single "substantial initial payment."

Nor is this case similar to *Wood* v. *United States*, 377 F.2d 300 (C.A. 5, 1967), certiorari denied 389 U.S. 977 (1967). There the taxpayer assigned an exclusive right to mine sand, gravel, and rock on his land for an indefinite period; the consideration for such assignment was a royalty interest, including a provision for a guaranteed minimum annual royalty. The court held that the agreement was a lease and that the royalty receipts were taxable as ordinary income rather than capital gains. In so holding, the court concluded that the taxpayer had to look solely to production for a return on his investment—the existence of minimum royalties did not alter that conclusion, *id.* at 307 and fn. 18— and he therefore had clearly retained an economic interest. Accord, *Standard Oil Co. (Ind.)*, 54 T.C. 1099 (1970). The same was true of the taxpayers in the other "hard mineral" cases relied on by the court in *Wood: Rabiner* v. *Bacon*, 373 F.2d 537 (C.A. 8, 1967) ; *Freund* v. *United States*, 367 F.2d 776 (C.A.

---

[7] That all of the water under petitioners' properties can be extracted is clear. It has been stipulated that that water is a nonrenewable resource and that there has been a substantial decline in the water table in the Ogallala formation. And we have found as a fact that under present conditions the Ogallala reservoir will be exhausted. See *United States* v. *Shurbet*, 347 F. 2d 103 (C.A. 5, 1965), affirming 242 F. Supp. 736 (N.D. Tex. 1961) ; cf. subpars. (A) and (B) of sec. 613(b)(6), I.R.C. 1954, classifying water and "inexhaustible resources" in separate categories.

[8] See *M. C. Puckett*, T.C. Memo. 1964-40.

7, 1966); *Laudenslager* v. *Commissioner*, 305 F.2d 686 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court, certiorari denied 371 U.S. 947 (1963); *Albritton* v. *Commissioner*, 248 F.2d 49 (C.A. 5, 1957), modifying 24 T.C. 903 (1955). Here, by contrast, petitioners received lump-sum cash payments upon execution of their contracts with Pan American; the payments were unrelated to production; and petitioners will receive no additional payments during the initial term of the contract.

The possibilities that petitioners will receive an additional payment at the end of 25 years, or that Pan American may not exercise its option to extend the agreement for an additional 20 years, do not prevent the transaction from constituting a sale. Cf. *Helvering* v. *Elbe Oil Land Co.*, 303 U.S. 372 (1938) (facts that payments of installments of purchase price were contingent upon purchaser's nonabandonment of the transaction and that taxpayer shared in the net profits of production did not prevent the transaction from being a sale); *Ima Mines Corporation*, 32 T.C. 1360, 1367 (1959), acq. 1960–1 C.B. 4 (consideration was a fixed sum, payable in annual installments, against which "excess royalties" were to be offset; held—taxpayer did not retain any economic interest, and the transaction was a sale); *Maude W. Olinger*, 27 T.C. 93, 97–98 (1956).

We hold that petitioners are entitled to long-term capital gain treatment of the receipts from Pan American. The purpose of the capital gains provisions was "to relieve the taxpayer from these excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." See *Burnet* v. *Harmel*, *supra* at 106. We are aware that this is an exception to the general rule as to the taxation of gains and has "always been narrowly construed so as to protect the revenue against artful devices." *Commissioner* v. *P. G. Lake, Inc.*, *supra* at 265; see *Commissioner* v. *Gillette Motor Co.*, 364 U.S. 130, 134–135 (1960); *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52 (1955); Comment, "Treatment of Gain from Disposition of Rental Property," 68 Col. L .Rev. 1174, 1187–1191 (1968). Nevertheless, we are convinced that petitioners' gain from the disposition of their water rights falls within the exception. When petitioners made their capital investments they acquired rights to the underlying water which very substantially affected the value of their land. In a single transaction they converted their valuable capital investments to cash, all taxable in a single year. In no real sense can it be said that the $56,000 received by each of the petitioners was a substitute for future income.

*Decisions will be entered for the petitioners.*