HOWARD GLENN AND BETTY S. GLENN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 81155. Filed November 27, 1962.

*John N. Stull, Esq.*, and *Ted P. Stockmar, Esq.*, for the petitioners.
*William J. McNamara, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined a deficiency in income tax for the calendar year 1955 in the amount of $362,712.99. The issue for decision is whether, as contended by the petitioner Howard Glenn, an amount of $900,000 received by him in 1955 constituted selling price of his 98 percent working interest in the oil and gas underlying certain land owned by him and is therefore taxable to him as long-term capital gain, or whether, as contended by the respondent, it constituted ordinary income subject to a depletion allowance.

### FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by this reference.

The petitioners are husband and wife whose address is Fort Morgan, Colorado. During the calendar year 1955, the petitioners kept their records and reported their income on the cash receipts and disbursements method of accounting. They filed a joint income tax return for the calendar year 1955 with the district director of internal revenue at Denver, Colorado. Since Betty S. Glenn is a party to this proceeding only because she and her husband filed a joint income tax return for the year 1955, Howard Glenn will hereinafter be referred to as the petitioner.

Since 1933, the petitioner owned in fee, land (including all minerals) situated in Morgan County, Colorado, described as "Township 2 North, Range 57 West of the 6th P.M., Section 31–NE ¼," but referred to herein as "Tract 15," containing 160 acres more or less.

In May 1953, gas was discovered in the "J" sand formation of an oil and gas field known as the Adena Field. In November 1953, oil was discovered in the "D" and "J" sand formations of the Adena field. Tract 15 lay entirely within the productive limits of the Adena field.

After the discovery of oil, the Adena field was developed rapidly and was operated on a competitive basis until January 1, 1956. On January 19, 1954, the Oil and Gas Conservation Commission of the State of Colorado issued orders which required 40-acre units for the production of oil and 160-acre units for the production of gas in the Adena field.

The petitioner was primarily a rancher and a dry land farmer at the time of the discovery of oil in the Adena field, with no previous experience in the oil and gas business. In order to protect his interests in the Adena field and to make decisions with respect thereto, he sought and relied upon the advice of certain advisers, including Carl Morgan, his office manager, Leo Manning, who was a well completion expert, and Ord Wells, an attorney. In January 1954, Morgan intro-

duced the petitioner to William H. Quinette, a certified public accountant who had extensive experience and personal dealings in the oil and gas business. They discussed the petitioner's properties in the Adena field, including Tract 15, and the possibility of Quinette's becoming one of the petitioner's advisers. Shortly thereafter Quinette was retained as an adviser to the petitioner, with the understanding, however, that in the future he might compete with the petitioner or might want to make a deal with him.

Early in 1954, Pure Oil Company, hereinafter referred to as "Pure," and Lion Oil Company, hereinafter referred to as "Lion," the two largest owners in the Adena field, favored and promoted unitization of the field, that is, the pooling of all interests in the field for development and operation on a cooperative basis. In March 1954, Pure invited all of the operators in the Adena field, including the petitioner, to attend a meeting to join in the formation of the Adena Field Operators Committee in order to exploit the field to its best advantage. It was agreed at this meeting to investigate the possibilities of unitizing the field and initiating a pressure maintenance program and to pool all information available for this purpose. Thereafter, various steering, legal, geological, and engineering committees were formed.

On May 13, 1954, Core Laboratories, Inc., hereinafter referred to as "Core Labs," an oil and gas consulting firm of Dallas, Texas, was employed by the operators to assemble and evaluate all available data and to make recommendations for the future operation of the field. The cost of the Core Labs report was shared by all of the working interest owners in the field. Core Labs had previously analyzed core samples for Pure and other individual owners, so that some of the necessary data had already been compiled.

In June 1954, the petitioner drilled and equipped four oil wells on Tract 15, all of which produced oil from the "J" sand formation. The wells had no basis for income tax purposes. On June 4, 1954, the Colorado Oil and Gas Conservation Commission issued an order which imposed limitations on the maximum production of oil and gas from any well from the "D" and "J" sands, and required each operator to make tests and report the gas-oil ratios of his producing wells.

On October 8, 1954, Core Labs issued its report containing its opinions and recommendations. The information contained therein was stated as being presented as of August 18, 1954, and predictions of future field behavior were made under the assumption that the program therein considered would be initiated as of January 1, 1955. The report stated that the data available was of a sufficiently complete nature to allow the presentation of reservoir predictions with a high degree of reliability. Core Labs concluded that: Gas should be gathered, compressed, processed, and sold from the field; it would be

economic to construct a gasoline plant for the purpose of producing natural gasoline; the reservoir was susceptible of yielding additional recoverable oil if unitized and injection of gas or water were undertaken; operating the field under a unitized method alone would yield an increase of 30 percent in the future net revenue to the operators over and above the revenues that would be obtained from the then competitive method of operation; gas injection under unit operation would yield a negligible increase in oil recovery; water injection was both feasible and desirable for optimum recovery; estimated gains in net revenues to the operating interests would be about 77 percent above revenues obtainable by then operating procedures, if a plan of water injection suggested in the report were adopted; and that to obtain the maximum advantages from the method of operation recommended, the owners should unitize their interests in the reservoir at the earliest possible time.

The report contained an estimate that the "J" sand of the Adena field originally contained 183,787,000 reservoir barrels of oil, which was equivalent to 135,038,000 barrels of stock tank oil.[1] It was further estimated that the oil zone originally contained 71,030 million standard cubic feet of gas in solution and that the gas cap zone originally contained 39,878 million standard cubic feet of gas.

Core Labs analyzed three production methods in its report: If production were continued under competitive operations without unitization, and under existing rules, an ultimate recovery of 29.9 percent of the original oil in place, equivalent to 40,365,000 barrels of stock tank oil, and 97,188 million standard cubic feet of gas would be obtained; unitization with production from selected wells, but without pressure maintenance, would increase the ultimate recovery to an estimated 37.3 percent of the original oil in place, or 50,315,000 stock tank barrels, and 97,675 million standard cubic feet of gas; and unitization with a water injection program[2] would bring about a minimum ultimate recovery of 50 percent of the oil in place, or 67,-519,000 stock tank barrels, and an ultimate gas production of 68,116 million standard cubic feet. Core Labs stated that the conformance factor which it had used in estimating the percentage of ultimate recovery of oil under the proposed water injection program was highly conservative for the field.

[1] Stock tank oil is the amount of oil produced at the surface of the ground; in measuring reserves, there are less stock tank barrels of oil than reservoir barrels because as the oil is produced, the in-solution gas comes out of the oil and the oil shrinks accordingly.

[2] The purpose of water injection is to replace the oil and gas which is produced from the reservoir in order to maintain the pressure in the field and to prevent the solution gas from breaking out of the oil prematurely. The injection of water actually drives oil to the producing wells, thus maintaining the high pressure differential between the injection well and the producing well to allow the flow of oil to continue at high rates. Water injection is not a natural process, but rather is commonly referred to as a secondary process, and produces "secondary" oil. "Primary" oil is produced by natural forces.

In the Core Labs report it was stated that the water injection program, under unitization, recommended to obtain maximum recovery from the "J" sand reservoir of the Adena field would effectively block movement of oil into the gas cap and at the same time supply sufficient water to the oil reservoir to form an effective water drive; that this program presented the only method for effectively controlling the movement of oil; that other water injection patterns would result in substantial waste; that under the proposed plan, future oil production revenue would be increased approximately $65 million from the entire "J" sand pool of the Adena field, or about $400,000 per oil well, over the revenue which would result from a continuation of the existing methods; and that the recommended program might reduce operating costs.

On or about October 12, 1954, the petitioner, together with other owners in the field, executed an agreement for the construction and operation of a gasoline plant in the Adena field. Pursuant thereto he acquired and continues to own an undivided interest in the plant.

On November 1, 1954, the petitioner executed a document transferring to Leo R. and Mabel H. Manning an undivided 2 percent working interest in and to all of the oil, gas, and other hydrocarbons which might be produced from Tract 15. Therein the petitioner specifically reserved the exclusive right to operate the property. This transfer was made by the petitioner to provide Manning with an incentive to render his best services in the completion of the wells on Tract 15, and was made pursuant to a prior agreement reached in April 1954. The consideration received by the petitioner for the transfer was $5,000.

A joint geological-engineering committee was formed on October 25, 1954, by the Adena Field Operators Committee to study possibilities of unitization and to attempt to develop a formula for unit participation which would be mutually agreeable and equitable to all owners of interests in the "J" sand of the Adena field. On November 4, 1954, such joint committee agreed that participation should be based upon the value of recoverable hydrocarbons by tracts under primary producing conditions without unitization, and that the first step was to determine the original oil and gas in place by tracts.

After the receipt and examination of the Core Labs report, the petitioner, at the suggestion of Manning and Quinette, obtained independent evaluations of Tract 15 from E. A. Polumbus, Jr., a competent petroleum engineer consultant of Denver, Colorado, and E. O. Gregory. Their report, hereinafter called the Polumbus report, was released in two sections on November 19, 1954.

The first section of the Polumbus report contained an evaluation of a 100 percent interest in the oil in the "J" sand of Tract 15 as of December 1, 1954, under existing primary competitive operations.

It showed that the recovery efficiency would be 30 percent and estimated that Tract 15 would produce a net total of 933,800 stock tank barrels of oil after December 1, 1954, with a net value, after deduction of net operating costs and net taxes, of $2,308,800 based on the then existing price of $2.85 per barrel of oil. The overall economic producing life was predicted to be 24 years. The report assigned no value to gas, because gas was not being sold at that time, but recognized a potential value of gas.

The second section of the report contained an evaluation of all of the oil in the "J" sand of Tract 15 as of December 1, 1954, assuming some form of unitization of the Adena field and water flooding. This section of the report estimated that the overall recovery efficiency would be 50 percent of the original oil in place and that Tract 15 would produce a net total of 1,721,300 stock tank barrels of oil after December 1, 1954, with a net value, after the deduction of net operating costs and net taxes, of $4,408,530, based on a price of $2.85 per barrel of oil. The estimated recovery time of the oil reserves was 24 years. The report did not consider salvage value of equipment and did not attempt to evaluate future gas production. The report "emphasized that the estimated recoveries and values given for the subject lease under unitization with water-flood must be considered speculative until actual field operations demonstrate the economics of flooding." It was standard practice to insert this type of language in engineering reports in such situations.

In the Spring of 1954 Quinette discussed with the petitioner a possible sale of the petitioner's interest in the oil and gas in Tract 15. Further discussions were had in 1954, both prior to and after the receipt of the Core Labs report but prior to the release of the Polumbus report. On January 12, 1955, Quinette made an offer to the petitioner on behalf of Jamar Oil Company, hereinafter referred to as Jamar, to purchase petitioner's interest.

On February 22, 1955, the petitioner and A. M. Lungren, president of Jamar, acknowledged an instrument, dated January 12, 1955, entitled "Assignment of Interest in Minerals." By the terms of such instrument the petitioner assigned to Jamar, as of January 1, 1955, his undivided 98 percent interest in all of the oil, gas, casing-head gas, and other hydrocarbon substances in place in and under Tract 15 above the base of the "J" sand formation (together with his interest in the oil wells and tools, machinery, etc.), expressly reserving and retaining to himself, however, certain percentages of such oil, gas, and other hydrocarbons in place which might be produced, saved, and sold (such percentages varying from 80 percent to 10 percent of the production, dependent upon the amount of monthly average production), until he should have recovered from the oil, gas, and other hydrocarbons produced and sold payments totaling

$2,850,000. The stated consideration for the assignment was $10 and other valuable considerations, but the actual agreed price was $900,000.

It was therein recited that the assignee or its assigns, in order to obtain funds with which to pay the purchase price of the petitioner's interest, intended to borrow from a bank the sum of $910,000 to be evidenced by a promissory note of the assignee or its assigns, to be dated February 1, 1955, and to be secured by a mortgage and deed of trust to be executed and delivered by the assignee or its assigns to the bank covering an undivided 97 percent of the oil, gas, and other hydrocarbons in place which might be produced and sold and an undivided 97 percent interest in the four oil and gas wells. It was specifically provided that the petitioner did not reserve any interest in the oil, gas, and other hydrocarbon substances in place which might be produced and sold during the period of time that the above-mentioned note of $910,000 to the bank remained unpaid in full.

It was further provided that until the petitioner had received all of his retained production payments, the assignee was precluded, without the prior written consent of the petitioner, from entering into, amending, or terminating any operating agreement or consenting to any change in the operator.

The capital stock of Jamar, consisting of 1,000 shares of $1-par-value common stock, was owned by A. M. Lungren and Jane Lungren as joint tenants, they having acquired their shares on July 2, 1954. Quinette had an understanding with Jamar that if Jamar were successful in obtaining petitioner's interest, Adena Oil Company and the Quinette oil interests would purchase such interest from Jamar. At January 1, 1955, Jamar's net assets amounted to $854.81.

The Adena Oil Company, hereinafter referred to as Adena, was incorporated on January 24, 1955, under the laws of Colorado. Its capital stock, consisting of 100 shares of $1-par-value common stock, was held as follows: Quinette 5 shares, his wife 90 shares, and his son 5 shares. During January, February, and March 1955, Adena owned no property except as pointed out hereinafter.

In early January 1955 Adena, by its president Quinette, made application to the United States National Bank of Denver, Colorado, for a loan of $910,000. The loan was approved by the loan committee of the bank on January 20, 1955, and by its executive committee on January 25, 1955. It was the bank's normal policy to lend about 60 percent of the value of property pledged to secure loans or about 50 percent of the estimated future net cash realization from such property. The bank's normal policy was not to loan money solely on the security of secondary oil not then in production.[3]

---

[3] The bank, on the basis of the Polumbus report, calculated that the $910,000 would be 59 percent of present net worth of Tract 15, estimated to be $1,677,750, and 39.4 percent of future net income by primary recovery, estimated to be $2,308,800.

434

By the terms of an instrument entitled "Assignment of Interest in Minerals" dated February 1, 1955, acknowledged February 22, 1955, and effective January 1, 1955, Jamar conveyed to Adena an undivided 97-percent interest in the oil and gas in place which might be produced from Tract 15 above the base of the "J" sand formation, and a 97-percent interest in the oil wells and equipment, reserving to itself an undivided 96-percent interest therein after repayment of the $910,-000 bank loan.[4]

On February 1, 1955, Adena, by Quinette as president, executed a promissory note to the bank in the principal sum of $910,000, plus interest, to be paid in minimum monthly payments of $16,851.85, the whole amount to be paid on or before August 31, 1959. It contained no guarantees or endorsements. It was provided therein that the note was to be secured by a mortgage and deed of trust which in turn was to contain provisions for payments by the trustee to the bank. It was further provided that on the last day of each month there should be applied, on account of the principal sum, all sums paid by the trustee to the bank, but that in the event the total of the amounts then and theretofore so applied should not aggregate the total amount required to have been paid at the minimum rate of $16,851.85 per month, Adena should make up the difference.

The mortgage and deed of trust securing the above note was executed by Adena, by Quinette as president. It was dated February 1, 1955, was acknowledged on March 17, 1955, and was effective January 1, 1955. It covered an undivided 97-percent interest in the oil and gas in place in Tract 15 above the base of the "J" sand which might be produced, saved, and sold and a 97-percent interest in the oil wells and equipment. It provided that Adena, at its own cost and irrespective of who might be the operator of the mortgaged property, would, among other things, cause the property to be operated diligently in accordance with good oil field practice to the end that each well should produce, to the extent of its capacity, the full daily amount allowable; make all necessary repairs; pay all taxes and other liabilities; carry insurance; and do all acts necessary to carry into effect the object and effect of the mortgage and deed of trust. It was provided that all proceeds of oil should be remitted by the purchasers directly to the trustee who should pay a sufficient amount to Adena to take care of costs of operation, and then pay 95 percent of the net proceeds to the bank to apply against interest and principal of the loan, and 5 percent to the borrower Adena.

---

[4] By the terms of an instrument entitled "Assignment of Interest in Minerals" executed on February 23, 1955, Jamar, for a consideration of $1,000, assigned to Quinette, his wife, his son, his daughter, and a business associate its undivided 1-percent interest and its 96-percent reversionary interest in and to all the oil, gas, and other hydrocarbons underlying Tract 15 above the base of the "J" sand and in the wells and equipment.

It was further provided that if Adena should fail to comply with any of the covenants, the trustee or the bank could perform the same and that any expenses incurred should be payable by Adena with interest; or the bank could declare the indebtedness due and payable, in which case the trustee and the bank could have a receiver appointed or have the property sold to satisfy the indebtedness.

The amount of $900,000 agreed upon between the petitioner and Quinette as the selling price upon the sale to Jamar was based upon computations and projections made by Quinette prior to the date of the offer to petitioner. These projections were based on the Polumbus and the Core Labs reports.

Quinette's projections were based on 98 percent of the oil and gas in the "J" sand of Tract 15 as of January 1, 1955. Therein it was calculated that this interest would produce, with unitization of the "J" sand formation and with water flooding, 1,674,722 stock tank barrels of oil with a gross value of $4,772,956 and a net value, after deduction of costs and taxes, of $4,288,235, assuming a selling price of $2.85 per barrel of oil. It was therein also estimated that the net value of gas production, calculated at 5 percent of oil production, would be $238,648. At that time, although the facilities for capturing gas did not exist, the gas plant and gathering facilities were in the process of construction (the gas plant went into actual operation in August 1955).

According to the projections, production of 392,891 stock tank barrels of oil with a gross value of $1,119,735 and a net value of $1,039,943 would be required to repay the bank loan of $910,000 and interest thereon; and the bank loan would pay out in 3 years and 3 months, during which time the purchaser, Jamar, would receive total net profits of $11,288 and the borrower, Adena, would receive total net profits of $51,432.

According to these projections, thereafter 1,255,031 stock tank barrels of oil with a gross value of $3,576,842 and a net value of $3,186,-790 would be required to pay out the petitioner's retained production payments of $2,850,000; the production payments to the petitioner would commence in April 1958 and pay out sometime in 1978; and during this period of payout the purchasers would realize total net profits of $336,790.

The projections indicated that the purchasers would receive net profits of approximately $400,000 prior to the payout of the production payments retained by the petitioner and approximately $300,000 thereafter.

At the time the petitioner consummated the transaction, he knew that Quinette and his family were involved in some manner and he accepted the offer made on behalf of Jamar upon the advice of his

advisers, other than Quinette. He did not investigate Jamar's financial condition and was not concerned about the details of the bank loan or what Jamar did with the property so long as he received his money. The transaction between him, Quinette, and Jamar was at arm's length. Based upon the Core Labs and the Polumbus reports, the parties believed that the property was worth at least $4,400,000. They considered that unitization of the "J" sand area of the Adena field was assured and that there would be a successful water flooding operation as proposed by Core Labs. In addition, there were certain other factors, which Quinette took into consideration and called to the attention of the petitioner and his advisers, which might cause the retained production payments to pay out earlier and might result in an increase in the purchasers' total profit. These included the beliefs that the Polumbus and Core Labs reports were conservative, that there was a probability of an increase in the price of oil, that there might be additional recovery by other secondary or tertiary methods, that Pure and Lion (the largest interest holders) would make every effort to recover the maximum amount of oil from the field, that there was a probability of recovering oil and gas from the "D" sand, and that the estimate in Quinette's projection of the value of the gas to be recovered was conservative.

At a meeting of the operators' committee held on January 25, 1955, the joint geological-engineering committee reported that one of the steps in determining the formula for unit participation had been taken, namely, the determination of the amount of original oil and gas in place, by tracts, in the "J" sand of the Adena field,[5] but that the actual determination of participation percentages had not been made. Such joint committee apparently completed its calculation of the unit participation percentages not later than March 15, 1955, and its written report covering its study of unitization of the Adena field "J" sand and its recommended formula was distributed to each representative of the working interest owners at a meeting of the operators' committee on March 24, 1955. The formula for unit participation was not satisfactory to all the operators and it was subsequently modified. A unit agreement was thereafter signed by all, except one, of the owners of tracts producing from the "J" sand. It bore date of July 18, 1955, was approved by the Colorado Oil and Gas Conservation Commission on December 22, 1955, and became effective January 1, 1956, with Pure as unit operator. The percentage participation of each interest owner was therein fixed. The Commission by order of July 31, 1956, fixed the amount of production to be permitted from the "J" sand of the Adena field and allocated such production between

---

[5] The joint committee estimated that there were 5,900,000 reservoir barrels of oil in place in the "J" sand under Tract 15.

the operators, namely, Pure, the operator of the unit, and another company which was operating the four producing tracts in the field which were not included in the unit. Thereafter, on October 1, 1956, such other tracts were added to the unit area, and the participation factors, including that of Tract 15, were correspondingly revised. On February 19, 1957, the Commission authorized the unit operator of the Adena "J" sand unit to conduct pressure maintenance operations by the injection of water in the "J" sand in the Adena field and such operations were commenced in February 1957.

The bank loan was paid off in full in December 1957, and the petitioner thereupon began to receive production payments of 80 percent of the proceeds from the 98-percent working interest in Tract 15.

Through April 1961, a total of 40,932,500 stock tank barrels of oil and 36,056,897 standard cubic feet of gas had been produced from the "J" sand of the Adena field, and petitioner had received payments of $1,345,340.12 of his retained interest, leaving a balance to be paid of $1,504,659.88. Such payments were considerably ahead of the schedule of payments contained in Quinette's projections above referred to. At that time 40 oil wells were producing in excess of 20,000 stock tank barrels of oil per day. There were also 40 oil wells capable of production which were shut-in awaiting the time when they could be most efficiently operated.

At the time of the trial of this case there remained approximately 40 percent of the oil zone of the "J" sand of the Adena field which had not yet been invaded by water, and there remained approximately 25 percent of the original volume of oil in the oil bank which had been created by the water injection process. The ratio of water produced to oil produced has been increasing since the middle of 1959 and such ratio showed a marked increase during 1960 due to an unusual amount of testing. However, there had been no marked decline in the actual amount of oil production up to the time of the trial of this case.

In the joint income tax return for the taxable year 1955, the petitioners reported the cash payment of $900,000, less documentary stamps of $990, as long-term capital gain. The respondent in the notice of deficiency determined that the entire $900,000 was taxable as ordinary income, subject to an allowance for percentage depletion. The only other capital gains or losses reported by the petitioners were a loss of $475 and a gain of $15,201.68.

The series of payments which the petitioner reserved in the transfer of his 98-percent working interest in the oil and gas in Tract 15 above the base of the "J" sand constituted production payments which could be reasonably expected, at the time of the transfer, to pay out substantially prior to exhaustion of the oil and gas interest transferred.

The amount of $900,000 received by the petitioner in the taxable year 1955 constituted the selling price of all his interest in the oil and gas and other hydrocarbons above the base of the "J" sand under Tract 15, except the production payments which were reserved.

OPINION.

It is well established that if the owner of oil lands executes an oil and gas lease in return for a bonus and stipulated royalties,[6] the bonus is regarded as an advance royalty and is, like the royalties, treated as ordinary income to the recipient. *Burnet* v. *Harmel*, 287 U.S. 103. However, where one assigns his interest in oil and gas for a cash consideration and retains only a limited interest, such as an oil payment (sometimes referred to as a production payment),[7] the transaction is a sale, and although the production payment constitutes ordinary income when paid subject to an allowance for depletion, the cash consideration constitutes proceeds from the sale of the interest. *Commissioner* v. *Fleming*, (C.A. 5) 82 F. 2d 324, affirming 31 B.T.A. 623; *Hammonds* v. *Commissioner*, (C.A. 10) 106 F. 2d 420, affirming on this point 38 B.T.A. 4; and G.C.M. 22730, 1941–1 C.B. 214.

The parties appear to be in agreement as to these fundamental principles, but they differ as to their proper application here.

The petitioner contends that the transaction here involved is what it purports to be, namely, a sale for $900,000 of all of his 98 percent working interest in the oil, gas, and other hydrocarbons underlying Tract 15 above the base of the "J" sand, except the oil and gas payments reserved in the amount of $2,850,000; he accordingly contends that the $900,000, less cost of documentary stamps of $990, constitutes long-term capital gain from the sale of a capital asset as defined in section 1221 of the Internal Revenue Code of 1954[8] or of property used in the trade or business as defined in section 1231.[9]

---

[6] A royalty interest is a right to receive a specified percentage of all oil and gas produced and lasts during the entire term of the lease. *Anderson* v. *Helvering*, 310 U.S. 404, and *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260.

[7] An oil payment is the right to a specified sum of money, payable out of a specified percentage of the oil, or the proceeds received from the sale of such oil, if, as and when produced. *Anderson* v. *Helvering*, *supra*, and *Commissioner* v. *P. G. Lake, Inc.*, *supra*.

[8] Sec. 1221 provides, in part, as follows:
For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

      *       *       *       *       *       *       *

  (2) * * * real property used in his trade or business;

[9] Sec. 1231 provides, in pertinent part, as follows:
  (a) GENERAL RULE.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such

The respondent concedes that the interest here involved was held by the petitioner for a period in excess of 6 months, but contends that there was not a sale thereof giving rise to long-term capital gain within the provisions of the statute.

The respondent's first contention is that the transaction was in substance a lease, with the result that the $900,000 cash payment received in the taxable year 1955 was an advance royalty taxable as ordinary income under section 61(a),[10] subject to an allowance for depletion. His ground for such contention is that even though reserved payments purport to be oil and gas production payments, if circumstances existing at the time of the transaction indicate that they will not pay out before exhaustion of the property transferred, the transferor has retained an interest extending over the economic life of the property, and the payments are therefore, in reality, royalty payments, the transaction is in effect a lease, and any initial cash payment is taxable as an advance royalty.[11]

The respondent states that the facts in the instant case show that the economic life of the oil and gas interest transferred was not, at the time of the transaction, deemed to be materially greater than the time required to pay out the reserved payments. He points to the fact that the Polumbus report estimated that under existing competitive operations a 100 percent interest in Tract 15 would yield oil of a net value of only $2,308,800 (which would be insufficient to pay out the retained payments), and that only if the field should be unitized and a successful program of pressure maintenance through water injection adopted would it yield oil of a net value of $4,408,530 (which would be sufficient to pay out the payments prior to the exhaustion of the property). He further states that from the Core Labs report it was apparent at the time of the transaction that there was no possibility that the retained interest would pay out before exhaus-

---

gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *

      *        *        *        *        *        *

  (b) * * * For purposes of this section—

    (1) GENERAL RULE.—The term "property used in the trade or business" means * * * real property used in the trade or business * * *

[10] Sec. 61(a) provides, in part, as follows:

GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

     *        *        *        *        *        *        *

  (6) Royalties;

[11] In this connection the respondent refers to *Anderson v. Helvering, supra; G.C.M.* 22730, 1941–1 C.B. 214: and G.C.M. 24849, 1946–1, C.B. 66. For discussions upon the subject, see Williams and Meyers, Oil and Gas Law, sec. 423.10; Breeding and Burton, Income Taxation of Oil and Gas Production, secs. 2.07, 6.04; Fiske, Federal Taxation of Oil and Gas Transactions, sec. 14.09; Arthur Andersen & Co., Oil and Gas Federal Income Tax Manual (8th ed. 1960) p. 215; Patterson, "Carved-Out Oil Payments," P–H Oil and Gas Taxes, sec. 1004.

tion of the property unless all the owners of working or royalty interests in the Adena field should, without delay, agree to a unitization program and adopt a pressure maintenance program, and unless such flooding operation should prove successful. He argues that 100 percent unitization was not assured in January 1955, the effective date of the contract, or in February 1955 when the contract was signed. He also points to the fact that in the Polumbus report it was stated that the estimated recoveries and values should be considered speculative until actual field operations demonstrated the economics of flooding.

We find it unnecessary to consider whether the general proposition advanced by the respondent is correct since, in our opinion, the facts necessary to support such a contention are not present here. Upon a consideration of all the evidence, including the testimony of the petitioner and Quinette, we are satisfied that the parties to the transaction were dealing at arm's length and that they believed that unitization of the "J" sand area of the Adena field was assured,[12] that there would be a successful water-flooding operation as proposed by Core Labs, that the property would yield oil and gas of a net value of at least $4,400,000, and that, therefore, the reserved payments would pay out before the end of the economic life of the property conveyed, leaving a substantial profit to the purchasers. We are also satisfied that upon the basis of the information which the parties had, including the Core Labs and the Polumbus reports, and other advice received, they were justified in their beliefs.

We think no significance is to be attached to the statement in the Polumbus report that the estimates made should be considered speculative until the economics of flooding were demonstrated by actual field operations. The evidence shows that it was standard practice to insert this language in engineering reports and that the purpose was merely to put interested readers on notice that the actual physical events upon the basis of which the probabilities were calculated had not yet occurred.

It may be also added that subsequent events have corroborated the beliefs of the parties. In April 1961 the payments to the petitioner were well ahead of the schedule of payments projected by Quinette, despite the fact that complete unitization was not achieved until October 1, 1956, and water injection was not commenced until February 1957. The division engineer for Pure testified that as a result of the delay in achieving unitization and water injection, the amount of

---

[12] The respondent on brief contends that under Colorado law there could be no forced participation in unitization or pressure maintenance operations, citing chapter 100–6–16 of the Colorado Revised Statutes (1953). However, chapter 100–6–4(6) of such statute would seem to authorize the Colorado Oil and Gas Conservation Commission to enforce unitization upon application of any interested party.

oil recovered might ultimately be somewhat less, but that there was also the possibility that the resulting gas saturation of the oil would increase the amount of oil produced. At the time of the trial of this case there had been no diminution of oil production in the field.

The fact that the petitioner retained an interest in the gasoline plant does not indicate that there was a reservation of an interest in the gas in place for the life of the property. See *Helvering* v. *Bankline Oil Co.*, 303 U.S. 362.

The respondent states that the petitioner retained the right to designate the operator of the property and to approve any operating agreement thereafter entered into, and that this is incompatible with an intention to divest himself of his interest in the property. We do not view this provision as reserving to the petitioner an economic interest in the property. This right was to extend only until the petitioner had received all his retained production payments, and was obviously intended as a security provision.

It is our conclusion that the reservation by the petitioner of the payments did not amount to a reservation in the property conveyed of an interest extending over its life, and that accordingly there is no basis for considering the reserved payments as royalties, the assignment as a lease, and the $900,000 cash consideration as an advance royalty.

The respondent advances the alternative contention that the essence of the entire transaction was the transfer by petitioner of his working interest in Tract 15, with the reservation of production payments totaling $3,750,000, "simultaneously selling or carving out the front-end thereof to Adena Oil Company to permit payment of the bank loan," and that, therefore, the $900,000 consideration was, as in *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, "essentially a substitute for what would otherwise be received at a future time as ordinary income," and is, therefore, taxable as ordinary income.[13] In this connection the respondent states that Adena did not, in substance, acquire any interest in the property interest pledged to the bank as security for the loan.

We cannot agree that such was the essence of the transaction. As we have previously stated, the parties were acting at arm's length, and in the assignment the petitioner transferred all the interest except the specified production payments totaling $2,850,000. It is true that such assignment contemplated that 97 percent of the oil and gas in place which might be produced would be pledged with the bank as security for the loan which was to be used to make the cash payment to

---

[13] The respondent states that some undisclosed portion of the $900,000 may have been paid for the working interest after completion of the production payments. It is his contention that such amount would be relatively small and that in any event the petitioner has not shown what portion of the amount was consideration for the working interest.

the petitioner. However, it was specifically provided that the petitioner did not reserve any interest in the oil and gas in place which might be produced while the loan remained unpaid. It was Adena that borrowed the money from the bank and pledged as security for the loan 97 percent of the oil, gas, and other hydrocarbons in place which might be produced. Adena obligated itself to cause the property to be operated in order to accomplish the repayment of the loan and it obligated itself to make the minimum monthly payments. The petitioner did not obtain the loan from the bank. There is no evidence which indicates, nor is there any claim made by the respondent, that Adena was acting for the petitioner in making the loan. Under the circumstances, we think it clear that the petitioner did not retain any interest in the property which was pledged to the bank. In short, the transaction was what it purported to be, namely, the transfer by the petitioner of all his interest, except the production payments totaling $2,850,000, for which he was paid $900,000 by Adena out of funds which Adena had borrowed from the bank.[14] Under the circumstances described above, we think it not determinative that Adena did not have other substantial assets or that the note to the bank contained no guarantees or endorsements.

The *Lake* case does not support this contention of the respondent. There the taxpayer-corporation was the owner of a seven-eighths working interest in oil and gas leases, and was engaged in the business of producing oil and gas. It was indebted to its president in the sum of $600,000. In consideration of his cancellation of the debt the taxpayer assigned him an oil payment right in the amount of $600,000 (plus an amount equal to interest at 3 percent on the unpaid balance of the loan), payable out of 25 percent of the oil attributable to the working interests. At the time of the assignment it was reasonably estimated that the assigned oil payment right would pay out in about 3 years, and in fact it did pay out in a little over 3 years, which was less than the life of the depletable property interest from which it was carved. The Supreme Court there held that there was no conversion of a capital investment; that what was assigned was the right to receive future income; that what was received was the present value of income which the recipient would otherwise obtain in the future as ordinary income; and that, therefore, the $600,000 was taxable as ordinary income, subject to depletion.

In the instant case what the petitioner transferred was not a right to an oil payment which would eventually have come to him as

---

[14] While the assignment was from the petitioner to Jamar, the instrument recognized that Jamar might assign the property to others, and it did assign the property to Adena. It is clear that Jamar was not acting as an agent of the petitioner. Why Quinette used Jamar is not made clear by the record, but in any event this cannot affect the tax consequences of the transaction to the petitioner.

ordinary income. As pointed out above, the $900,000 which he received was in consideration for his transfer of all his 98 percent interest in the oil, gas, and other hydrocarbons above the base of the "J" sand of Tract 15, except production payments totaling $2,850,000.

It is our conclusion that the respondent erred in treating the amount of $900,000 as ordinary income. The gain derived by the petitioner is to be treated as long-term capital gain from the sale of either a capital asset or of real property used in his trade or business.

*Decision will be entered under Rule 50.*